COLE, Judge.
This appeal concerns the plaintiffs’ claim of an unmerchantable title, which they attribute to the threat of litigation concerning the obligations of a developer who formerly owned the land.
Plaintiffs (Billy Joe and Joan Buzbee and Thomas Ray and Ruby Lee Engquist) sued their vendor, Fidelity National Bank, on a warranty of title claim. Fidelity named as third-party defendants the developer Jack Menzie and Menzie’s vendee, Million Acre Corporation. An intervention was filed by two of the original five landowners (Margaret Preston Moore and Robert Preston) and *17 the heirs of a third owner (Allen A. Wright, Walter Wright and Frankie H. Pitcher). Cameron-Brown-South, Inc., the owner of an adjoining parcel, joined the intervention on the claim that it had been assigned rights by the two remaining original vendors. The intervenors seek judicial declaration of whatever rights, privileges or liens remain on the property. Following judgment for plaintiffs in the trial court, and dismissal of the intervenors, Menzie appealed and all other parties joined the appeal.
The major issues are: (1) whether the title is nonmerchantable; (2) if so, which parties owe damages and in what amount; and, (3) whether the obligations have been fulfilled or otherwise extinguished. If the obligations have been met, compromised or released, intervenors would be denied declaratory relief.
We set out the facts in chronological order where possible, to trace the sometimes complicated real estate transactions surrounding this land.
Prior to 1971, a 1,100 acre tract of land in East Baton Rouge Parish called the Hob-good Tract was owned by five people in indivisión: J. Russell Doiron (one-quarter interest); Mrs. Ray (Rachel) Durrett (one-quarter interest); Nell P. Stipe (one-quarter interest); Frank B. Preston and Margaret Preston Moore (one-eighth interest each). The Hobgood tract was bounded on the north by the Comite River and Cypress Bayou, on the east by Joor Road, on the west by East Glenn Oaks Subdivision and Glen Oaks Park and on the south by Green-well Street. Mickens Road cut diagonally across the tract. Doiron, a real estate agent, had represented the other owners with regard to this tract since 1940.
In 1971, developer Jack Menzie negotiated to buy part of the property, and Doiron acted as agent for himself and his co-owners. Menzie purchased 204 acres in the southwest corner of the Hobgood Tract. Menzie’s tract was bounded on the south by Greenwell Street and on the north by Mickens Road, with Roberts Canal (the northern branch of Hurricane Creek) cutting across the tract. Doiron and his co-owners retained ownership of the remainder of the Hobgood tract, which lay to the north and east of Menzie’s tract. Doiron, Durrett, Stipe, Preston and Moore transferred their respective interests to Menzie in separate acts of sale with mortgage. In each act Menzie agreed to pay cash and to construct a bridge and two streets on his property. Menzie’s agreement regarding the north-south street was set out in detail: he was to extend Lanier Drive so that Lanier would lead to the property north of Mickens Road which Doiron, Durrett, Stipe, Preston and Moore continued to own.[1] The proposed route of the Lanier extension was drawn on a map attached to the separate acts of sale. Menzie was also to build a bridge for Lanier to cross Roberts Canal and a road to run from west to east across his property. The road’s eastern terminus was apparently meant to be at or near property still owned by Menzie’s vendors, but its exact route was never set out.
On September 3, 1972, Menzie transferred a 150-acre parcel of his 204-acre tract to Million Acre Corporation. This transfer was executed as an exchange of property. *18 The land Menzie transferred to Million Acre was north of Roberts Canal, and included the portion where Menzie had agreed to route Lanier so as to have Lanier intersect with land owned by Doiron, et al. Million Acre specifically agreed in writing to assume the obligations undertaken by Menzie. However, on the same day, Million Acre Corporation sold the 150 acres to East Glen Oaks, Inc. The act of sale executed by East Glen Oaks at purchase made no reference to the obligations of Menzie or the agreement by Million Acre to undertake those obligations.
On October 6, 1972, the mortgages placed on Menzie’s property when he bought from Doiron, et al., were marked paid and cancelled. Doiron, acting for himself and his co-owners, cancelled the mortgages in exchange for Menzie furnishing the vendors with a bond, construction contract and letter of credit. These were meant to guarantee the vendors that the bridge and street construction would be completed in accordance with Menzie’s original contract.
In December 1972, Menzie’s remaining 54 acres (located south of Roberts Canal) were released from the mortgage, and from any vendors lien or resolutory conditions owed to the original vendors. The releases were executed by Preston, Moore, Stipe and Mrs. Durrett. The releases in part said “... any conditions imposed by any of the four (acts of sale with mortgage) do not attach to the property described in Exhibit B hereto as resolutory conditions or in any way effect in any means whatsoever, said described property as said property is totally free and clear of any and all obligations, conditions or any other possible encumberances....”
The bridge across Roberts Canal for the extension of Lanier Drive was subsequently completed. East Glen Oaks, Inc. took the proposed route for Lanier Drive, as Menzie had promised to build it, before the City-Parish Planning Commission and asked for approval. East Glen Oaks had not expressly agreed to assume Menzie’s obligations at the time of purchase, but in September 1972, East Glen Oaks, Inc. made a written agreement with Doiron to construct Lanier in the route which Menzie had agreed to build the street. The planning commission rejected the proposed route because it did not conform with the parish master plan for roads and streets. East Glen Oaks redrew the Lanier extension to match the master plan and won approval. Lanier Drive was subsequently extended to Mickens but it did not intersect Mickens at a point directly across from lands held by the original vendors.
In December 1975, East Glen Oaks, Inc. defaulted on mortgages held by Fidelity National Bank and Cameron-Brown-South, Inc. The mortgages covered all the land originally purchased from Menzie. At sheriff’s sales in January 1976, Fidelity bought in 96 acres which its mortgage had covered and Cameron-Brown-South bought in 55 acres. The 55-acre tract included the land underlying and on either side of Lanier. The Fidelity tract included all the land on the south side of Mickens Road and to the east and west of the Lanier extension.
In June 1979, Doiron and the other co-owners of the remaining Hobgood tract sold their interest in the property north of Mickens Road and east of Menzie’s original parcel to two developers, Victor Coursey and Heidel Brown. The sale encompassed all the land to which the Lanier extension and the east-west road was to be built.
On July 13, 1979, Fidelity sold the 96 acre tract to plaintiff with full warranty of title. No title examination was performed by the bank or requested by plaintiffs. Fidelity sold the land for $512,427.00 and took mortgages for $470,000.00 on the unpaid balance from plaintiffs.
In late 1980, Doiron was told the new owners of the land north of Mickens and east of Menzie’s former parcel wanted written assurances the conditions and obligations of Menzie were either accomplished or waived. In separate acts dated from December 6, 1980 to January 6, 1981, Doi- *19 ron, Mrs. Durrett,[2] Margaret Preston Moore and Frank Preston, declared and acknowledged as follows: “that Menzie or his successors in title have satisfactorily complied with all the obligations contained therein and that, regardless, appearer hereby waives and renounces any resolutory conditions and vendor’s lien that may have been created as a result of any conditions and obligations imposed upon Jack G. Men-zie_”
On October 29, 1981, developers Coursey and Brown reeonveyed title to the land they had bought from Doiron, Durrett, Preston and Moore. The dation en paiment stated the land was returned because the sale price for the land was not paid by the vendees.
In acts dated in May and December of 1981, Doiron, Durrett, Preston and Moore sought to revoke the acknowledgments executed a year earlier which had said Menzie fulfilled all his obligations to build a bridge and two roads. The acts of revocation claimed the earlier acknowledgment and release were based upon a misrepresentation of facts as to the location of the Lanier extension to Mickens. Doiron had been the party allegedly misinformed as to the location of Lanier, and acted as agent for the co-owners in obtaining the acknowledgments.
At approximately the same period, Dur-rett and Doiron accepted a cash settlement to compensate them for damages to their interests north of Mickens Road, caused by the “mislocation” of Lanier Drive. Moore and Preston subsequently accepted cash settlements for the mislocation of Lanier. In all, $78,250 was paid to the original vendors to compensate them for the damages they suffered because Lanier did not intersect Mickens at a point across from their property.
In mid-1982, plaintiffs interested potential buyers in their land south of Mickens Road. However, a subsequent title opinion rejected title to the land as nonmerchanta-ble because the public records showed unfulfilled resolutory conditions and because there were two suits pending in federal court, over matters connected with the sale of the Menzie tract and the Hobgood tract.[3] Plaintiffs brought suit against Fidelity National Bank in May 1982. In July 1982, Preston, Moore and the heirs of Nell Stipe filed an intervention. Cameron-Brown-South was later added as an intervenor. Fidelity named Menzie and Million Acre Corporation as third-party defendants. Fidelity also filed a reconventional demand against the intervenors, alleging a lack of interest. On July 27, 1983, plaintiffs sold 10.75 acres of their 96 acres to Baton Rouge Recreation and Parks Commission (BREC). However, shortly after the sale the BREC attorney contacted the plaintiffs’ attorney, said he realized the tract had title problems and asked for a rescission of the sale. Plaintiffs refused to refund the purchase price.
Plaintiffs’ suit against Fidelity sought a rescission of the sale of their tract, cancellation of the mortgage indebtedness, damages, costs, interest and attorney’s fees for the prosecution of the claim. Plaintiffs based their claim on allegations the title was unmerchantable, that Fidelity breached warranty of title and plaintiffs were (constructively) evicted from their property. Intervenors sought judgment recognizing and confirming their rights of resolution contained in the sale to Menzie, and their vendor’s lien and privilege. Fidelity sought judgment against Menzie or Million Acre Corporation for any judgment rendered against it. Fidelity also sought judgment cancelling and erasing any rights of *20 rescission, mortgages, liens, privileges, re-solutory conditions and other real rights in the property.
The court bifurcated the trial and first considered whether title was good and merchantable. It ruled as follows:
1. Title to the property was good and merchantable, but the court reserved judgment on whether there was a suggestion of litigation for the damages phase.
2. The petition of intervention was dismissed with prejudice.
3. Fidelity’s demand against inter-venors for damages and attorneys fees was dismissed with prejudice.
4. Judgment for Fidelity against the in-tervenors was granted, as the court declared:
(a) the intervenors have no right or interest in the land;
(b) title to the property was good and merchantable; and
(c) any and all mortgages, liens, privileges, resolutory conditions, rights of rescission, encumberances and any other real rights are cancelled.
The court’s oral reasons for judgment said the conditions imposed upon the developer were placed in the acts of sale such that the mortgages were not to be can-celled unless the conditions were met.[4] The court found the original vendors, by accepting the sale price and cancelling the mortgages, agreed to a termination of any condition running with the land.
After trial on the issue of damages, the court assigned written reasons and ruled:
1. Title to the tract purchased by plaintiffs was suggestive of litigation at the time Fidelity National Bank sold the property to plaintiffs.
2. Judgment was granted to plaintiffs against Fidelity for $732.00 (the fees for the plaintiffs’ title opinion); and, for $18,-631.88, representing the amount of interest paid by plaintiffs on a 4.7 acre tract that remained unsold because plaintiffs’ title was rejected by the prospective buyer.
3. Fidelity National Bank was granted judgment against Jack Menzie for the $732.00 and $18,631.88 sums. The court concluded the title problems resulted from Menzie’s failure to construct the streets as promised. Interest on these sums is to run at the legal rate from the date of judicial demand until paid.
4. Judgment was given to plaintiffs for its attorneys fees, the sum of $17,465.99, against Fidelity. Menzie was not held liable to Fidelity for the attorneys fees.
5. The plaintiff was also granted judgment against Fidelity for the expert witness fee of $2,500 and Fidelity was granted judgment against Menzie for this sum and other costs.
Million Acre Corporation was never served. Menzie, the intervenors, and Fidelity all appealed to overturn the judgment and plaintiffs appealed, asking for full reimbursement of the purchase price.
MERCHANTABILITY OF THE LAND TITLE
In the liability phase of trial, the court found the title to plaintiffs’ tract good and merchantable, but in the damages phase the court found the title suggestive of litigation at the time of its sale to plaintiffs. We disagree with the trial court’s approach, preferring to consider the issue of merchantability as one question. We see no strong reason to bifurcate the merchantability issue into separate inquires of good and merchantable title, and the suggestion of litigation. In most cases, the terms are used synonymously; when the court finds a suggestion of litigation, the title is deemed nonmerchantable, while an *21 other court might say the title suggests litigation because it is nonmerchantable. In Young v. Stevens, 252 La. 69, 209 So.2d 25 (1968), at 35, the Court said, “We conclude that Mrs. Stevens’ title is suggestive of litigation and is therefore not merchantable.” The same statement of the issue was used in Lake Forest, Inc. v. Bon Marche Homes, Inc., 410 So.2d 362 (La.App. 4th Cir.1982), “A purchaser cannot be required to accept a title which is suggestive of litigation. Such a title is not merchantable, as it could not be readily sold or mortgaged in the ordinary course of business by reasonable persons familiar with the facts and questions involved.” We find the conclusion the title was suggestive of litigation at the time of sale and at the time of the plaintiffs’ belated title opinion in 1982 is fully supported by our review of the entire record. Therefore we affirm this finding and reverse the court’s decision in the liability phase that the title was good and merchantable.
The question of merchantability of title arises frequently in the context of purchase agreements, when the buyer will not close a sale because the seller cannot deliver a satisfactory title. The test for merchantability was stated in Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963), at 29, “... [I]t is when there are outstanding rights in third persons (not parties to the action) who might thereafter make claims of a substantial nature against the property, and hence subject the vendee to serious litigation, that the title is deemed not merchantable.” (Emphasis by Court.) This court followed the tests outlined in Kay v. Carter, supra, and Young v. Stevens, supra, in White v. Batson, 317 So.2d 205 (La.App. 1st Cir.1975). In White v. Batson, we noted, “In the record we find testimony of members of the bar who, as expert witnesses, expressed opinions pro and con on the merchantability of title. We are not impressed adversely by the honest opinion of such witnesses who might feel the title to the subject property is suggestive of serious future litigation.”
The trial court in the instant case was similarly impressed by the testimony of a member of the local bar whose title opinion for a prospective buyer rejected the title. Warren L. Mengis testified he found “very serious title problems.” The title was not merchantable, he said, because there were unfulfilled resolutory conditions, part of the property was restricted to residential use and he found litigation already in progress in federal court concerning the same property (see footnote 3, supra). The court found there had been no offers for the land (with the exception of BREC) since Mengis rejected the title. The BREC attorney questioned the title after the sale passed and testified he belatedly realized the property title was clouded. Of the obligations undertaken by Menzie, only the bridge was built as planned. The east-west street was never built and the Lanier extension reached Mickens at a point distant from land owned by Menzie’s vendors. The trial court correctly concluded plaintiffs’ title was suggestive of litigation. After trial, the court dismissed the inter-venors’ claims that the obligations Menzie assumed in 1971 were still owed to them. The court further held all mortgages, liens, privileges, resolutory conditions, rights of rescission, encumberances and any other real rights in the property were cancelled. This ruling does not operate to retroactively clear plaintiffs’ title and make it merchantable and not suggestive of litigation in 1982. A full adversarial proceeding, the inspection of numerous documents and testimony of numerous witnesses was necessary for the court to reach this conclusion.
A similar conclusion was reached in Lake Forest, Inc. v. Bon Marche Homes, Inc., supra. The court said: “The mere fact that suit brought by an adverse possessor or his heirs may eventually fail does not make the title merchantable.” Inspection of the public records by experienced attorneys left them of the opinion the title was not meehantable at the time of the proposed sale. The trial court further found title to plaintiffs’ property was suggestive of litigation when Fidelity sold to plaintiffs. We find no error in this conclusion.
*22 THE INTERVENORS’ RIGHTS
The intervenors represent two of Men-zie’s vendors, Moore and Preston, and some of the heirs of Nell Stipe, deceased. Cameron-Brown-South intervened claiming it held rights assigned to it by Durrett and Doiron, the other original vendors.
We affirm the trial court’s dismissal of the intervenors’ claim.
Menzie’s contract with the vendors was a mixed contract. He promised .to pay the vendors and he promised to build a bridge and two streets on his property in such a manner that it might benefit the vendors’ remaining property. The obligations to do so were clearly written into the acts of sale with mortgage with all five vendors. The trial court found the mortgages were not to be cancelled unless all of Menzie’s obligations were met. The court ruled the vendors agreed to terminate the conditions upon Menzie’s purchase when they can-celled the notes. Doiron, acting for the co-owners and himself, sought to keep Menzie’s obligations to build alive by requiring a bond, letter of credit and contract at the time he surrendered the mortgage notes.
In addition to cancelling the mortgage notes, the vendors executed acknowledgments that all Menzie’s obligations were fulfilled and that regardless the vendors waived and renounced any resolutory conditions and vendors lien they might possess. These acknowledgments were later purportedly rescinded when Doiron found out he was “misinformed.” The effect of the attempted revocation of the acknowledgments was not decided by the trial court.
Shortly after the attempted revocations of the acknowledgments was recorded, all the vendors (with Durret representing her own and Nell Stipe’s interest) accepted cash payments to compensate them for damages they suffered by the mislocation of Lanier Drive. At the time of the cash settlements, the vendors owned only land north of Mickens and had sold their land east of the Menzie tract. These settlements assigned whatever remaining rights the vendors had in the resolutory condition, vendor’s lien and mortgages to Cameron-Brown-South, an intervenor.[5] These agreements to accept cash instead of the desired location of Lanier Drive extinguished whatever remaining rights the vendors had in the property.
Other than Preston and Moore, none of the intervenors were directly involved in the numerous transactions involving this property; Preston and Moore are Florida residents and were represented in transactions regarding this property by Doiron, their long-time real estate agent, who is not a party to this suit. The intervenors testified they were asserting whatever rights they might have remaining in the property.
On this record we find no error in the trial court finding intervenors lacked any right or interest in the property, and affirm his ruling that all mortgages, liens, privileges, resolutory conditions, encumberanc-es or other rights are cancelled and erased.
DAMAGES
The court’s apportionment of damages is also before this court on appeal. Plaintiffs seek a full refund of the $512,427.00 purchase price. Fidelity seeks to overturn the award against it of plaintiffs’ attorneys fees, damages for interest paid on the mortgages and the failure to give Fidelity judgment against Menzie for the bank’s attorneys fees. Menzie contests judgment in favor of Fidelity and against him for damages to plaintiffs. The trial court’s written reasons for judgment set out the damage awards.[6]
*23 A rescission of the sale and full refund of the purchase price is not necessary because the court’s judgment can-celled and erased any and all remaining mortgages, liens, conditions or other real rights attached to plaintiffs’ land. Additionally, plaintiffs have sold 10.75 acres of the 96-acre tract. The conclusion of this litigation will render the title to the remaining 85.25 acres merchantable. The court calculated damages based on the prospective offer to purchase 4.7 acres for commercial use. By calculating the interest paid on plaintiffs’ mortgage, the court apportioned part of the interest expense to the 4.7 acre parcel. The court ruled plaintiffs’ damages are the interest it had to pay on the unsold parcel, the cost of the title opinion, the attorneys fees and court costs entailed in bringing suit. We find no manifest error in the court’s formula for calculating damages.
The settled rule is attorneys fees are not granted unless authorized by law or by a contract between the parties. Attorneys fees are not considered part of the damages in a defective title suit. Calvary Tabernacle v. La. Central Bank, 393 So.2d 708 (La.1981); La.Civ.Code art. 2506; Guthrie v. Rudy Brown Builders, Inc., 416 So.2d 590 (La.App. 5th Cir.1982).
The purchase agreement warranted good title and specified if either vendor failed to comply with the purchase agreement, that party would be liable for fees and costs necessary to enforce the contract. The trial court relied on this contract between plaintiffs and Fidelity to grant attorney’s fees against Fidelity in plaintiffs’ favor. We find no error.
Menzie was cast in judgment for all damages which Fidelity had to pay, with the exception of plaintiffs’ attorneys fees. Menzie was not a party to any agreement between plaintiffs and Fidelity. Attorneys fees are not allowed unless authorized by law or by a contract between the parties. Gewin v. Willamette Industries, 406 So.2d 730 (La.App. 3d Cir.1981). We find no error in denying Fidelity judgment against Menzie for plaintiffs’ attorneys fees.
We modify the judgment to reverse the court’s finding of a good and merchantable title to plaintiffs’ property. The judgment is affirmed in all other respects.
REVERSED IN PART; AFFIRMED IN PART.

. The language in the Acts of “Sale with Mortgage” reads in part:
"Buyer [Jack G. Menzie] as a part of the consideration for this sale, obligates himself to the seller to construct or cause to be constructed, without cost or expense to seller, Lanier Drive in accordance with the requirements of the City-Parish Authority, though the entire property herein sold on a course so that its intersection with Mickens Road and any later extension thereof beyond Mickens Road to Hooper road shall be through the property presently owned by seller jointly with Nell P. Stipe, et al, lying between Mickens Road and Hooper Road, all as shown on the proposed center line thereof on the survey attached to this act. The construction of this Lanier Drive shall include the construction of a bridge across the north branch of Hurrican Creek.
"Buyer, as an additional part of the consideration hereof, obligates himself to seller to construct, without cost or expense to seller, within two years from date hereof, a street leading from said proposed Lanier Drive in said tract "B" in an easterly direction, across said tract “B” to land presently owned by seller, jointly with others.” [This language is contained in the acts executed by all vendors.]

. Mrs. Durrett’s acknowledgment declared she represented her original interest and the interest formerly held by the late Nell P. Stipe. Mrs. Durrett was a universal legatee of Nell Stipe and was the heir of Francis Kent Holcombe, another universal legatee of Nell Stipe, and now deceased.

. These suits were: Cameron-Brown-South, Inc. v. Margaret Preston Moore, et al., CA-81-415-B, U.S. District Court for the Middle District of Louisiana, and, Roy E. Hurd d/b/a Mickens Place Development v. Cameron-Brown-South, Inc., CA-81-101. These suits were consolidated and settled prior to trial.

. The Act of Sale with mortgage read,
"Provided further, however, anything to the contrary notwithstanding, there shall not be any lots or acreage sold in Tracts B and C or any lots or acreage released from the mortgage and vendors privilege until the proposed extension of Lanier Drive has been constructed from Greenwell Street to Mickens Road and the bridge over the North branch of Hurricane Creek (Roberts Canal) has been constructed, or bond furnished for construction....”

. W.G. Robinson, the representative of Cameron-Brown-South testified the company has never owned interests in land north of Mickens Road or east of the proposed location of the east-west street. He said the company's only interest is in the 55 acres which lies between the east and west portions of plaintiffs’ property.

. The reasons read in part:
“The Court is of the opinion that plaintiff should receive damages for the amount of Mr. Mengis’ fees, $732.00, plus any interest paid on the 4.7 acres from the date of the purchase agreement until the judgment becomes final.
*23 "The offer by the prospective purchasers to buy 4.7 of the commercial acres from Mr. Buz-bee occurred on or about February 4, 1982. Since that date, $158,568.61 of interest has accrued on the 96 acre tract. Apportioning the $158,568.61 of interest to the 96 acres, taking into the account that the commercial property is worth three to one what the residential property is worth, $3,964.23 of interest is apportioned to each commercial acre and $1,321.41 is apportioned to each residential acre. By multiplying 4.7 acres by the commercial rate of $3,964.23, the figure of $18,631.88 is attained. This is the amount of damages attributed to Mr. Buzbee’s inability to sell the 4.7 acre tract. Therefore, $732.00 and $18,631.88 are the amounts of damages awarded to plaintiffs from Fidelity National Bank. Fidelity National Bank is awarded judgment in like amount on its third party demand over and against Jack Menzie."