CIACCIO, Judge.
In June of 1981 Theo H. Harvey, Jr. sold all of the outstanding stock of Harvey Press, Inc. to Dixie Graphics, Inc., a Tennessee corporation, for cash and other consideration including a promissory note in the amount of $1,500,000.00 pursuant to a stock purchase agreement.
Shortly thereafter Dixie found itself unable to make the payments due under the note. Dixie requested and Harvey granted eonces- *114 sions and extensions of the terms of payment.
When it became evident that Dixie would not be able to pay the installments due under the note, Harvey and Dixie negotiated a buyback agreement whereby Harvey re-acquired all of the outstanding stock of Harvey Press, Inc. pursuant to a Stock Purchase Agreement dated November 19, 1982, annexed to this opinion as Exhibit A. The transaction was essentially a dation en paiment.
On November 22, 1982, Harvey sold and transferred all of the outstanding stock of Harvey Press, Inc. to Rebsamen Companies, Inc. The Stock Purchase Agreement between Harvey and Rebsamen dated November 22, 1982 contained certain warranties requiring Harvey to indemnify Rebsamen for losses it might sustain as a result of the breach of any warranty given by Harvey or as a result of any undisclosed or contingent liability in excess of $10,000.00.
In July of 1984 Rebsamen notified Harvey that the Internal Revenue Service was examining the tax returns of Dixie and its present and former subsidiaries and was proposing certain adjustments that would create a large tax deficiency against Harvey Press, Inc..
Although Harvey vigorously contested the proposed assessment, in view of the apparent correctness of the claim of the Internal Revenue Service, the tax ease was settled. Harvey Press, Inc. paid a tax deficiency of $91,-542.00 plus interest of $85,682 and Rebsamen called Theo Harvey in warranty for reimbursement of these sums. Harvey paid Reb-samen, received a conventional subrogation, and made demand upon Dixie for reimbursement of the tax assessment, interest and legal and accounting fees of $31,000.00, claiming that Dixie was liable for those amounts under the terms of the November 19, 1982 Stock Purchase Agreement.
Dixie denied liability. Harvey sued on June 15, 1987, the case was tried in November of 1991 and judgment was rendered on January 14,1992 in favor of Theo D. Harvey, Jr. and against Dixie Graphics, Inc. in the amount of $208,233.98. Dixie filed a suspen-sive appeal and Harvey answered the appeal asking for attorney fees and expenses of the trial.
The tax assessment resulted from the action of the Internal Revenue Service disallowing a loss claimed on the tax return of Harvey Press while it was owned by Dixie. Shortly after Dixie had purchased Harvey Press several hundred thousand dollars were withdrawn from Harvey Press and approximately $450,000 was placed in a pooled bank account of several interrelated companies. These funds were never repaid to Harvey Press. When the 1981 tax return was filed for Harvey Press as part of a consolidated return the cash funds that had been taken from Harvey Press and not repaid were claimed as a loss, resulting in a loss carry-back and a claim for refund for prior tax years when Harvey Press had been profitable. When the returns were audited the loss was disallowed because the Internal Revenue Service claimed the deduction was in violation of the income tax laws and regulations, resulting in the tax assessment ultimately paid by Harvey. The correctness of the assessment is not raised as a defense in this litigation.
On appeal Dixie urges that the trial court erred by basing its holding on a warranty not contained in the stock purchase agreement and by misinterpreting the specific warranties contained in the agreement. Dixie further urges that the trial court erred in finding that Dixie had actual knowledge of the undisclosed tax liability.
We define the issues in this appeal to be two-fold:
1) Does the language of the stock purchase agreement make Dixie liable to indemnify Harvey for an undisclosed tax liability;
2) If the agreement is silent or ambiguous regarding a contingent or unknown tax liability, who should bear the risk of loss.
At the outset we find that the trial court erred in excluding plaintiffs claim for relief under the provisions of Section 3E of the contract.
Our Code of Civil Procedure provides for fact pleading and does not require the petition to allege the theory of the case. C.C.P. *115 Art. 862 requires the court to grant any relief to which the party is entitled even if such relief was not demanded in the pleadings.
Plaintiffs suit alleged breach of the purchase agreement contract and a claim for indemnification for the loss sustained by Harvey. The allegations of plaintiffs petition were broad enough to allow the introduction of evidence to prove the breach of any warranty or provision of the contract. The entire contract was offered in evidence and the trial judge permitted the introduction of evidence on all facets of the agreement. Although the trial judge apparently believed he was limited to granting relief under the provisions of Section 8D and focused his reasons for judgment on the actual knowledge of the seller, we find additional grounds to affirm and-we are not limited to the reasons given by the trial judge.
The trial court gave the following reasons for judgment:
Harvey repurchased the stock of Harvey Press from Dixie on November 19, 1982. This was accomplished by a Stock Purchase Agreement. After repurchase, Harvey sold the stock to Rebsamen with warranties.
The I.R.S., after an audit of the tax returns, charged Harvey Press with taxes and interest. Mr. Harvey paid to Harvey Press the sum of $177,233.98 including interest and accumulated a bill for professional fees of $31,000.00 in this transaction. Mr. Harvey now sues Dixie under this Stock Purchase Agreement for this sum plus the costs of this litigation.
In the Stock Purchase Agreement, Dixie agreed to hold Mr. Harvey harmless for any breach of warranty on the part of Dixie.
The court finds that Dixie had actual knowledge of the problems with the tax returns which were filed and thereby had actual knowledge that the tax returns were not filed as required by law.
The trial court made a finding of fact that Dixie had actual knowledge that the tax returns were not filed as required by law. Our review of the testimony and exhibits offered in evidence supports this finding.
Plaintiff offered the testimony of Joseph Murphy, C.P.A., an experienced tax practitioner, who stated that the deductions which produced the tax loss on the Harvey Press tax return were clearly in violation of the Internal Revenue Code and should not have been claimed. He further testified that the I.R.S. was correct in disallowing the deductions and in making the assessment.
The trial judge apparently concluded that Dixie knew or should have known that these deductions would result in a later assessment. This conclusion was supported by the chain of events beginning with the tax bill of $135,189.59 sent Harvey Press by the I.R.S. on April 26, 1982, the granting of a power of attorney to Dixie’s C.P.A. to handle this matter with the I.R.S., and the absence of any documentation to prove that this tax matter had been conclusively resolved in Dixie’s favor.
Lengthy testimony was offered by accountants, lawyers, and representatives of plaintiff and defendant. Some of the testimony was contradictory and the actions of defendant’s representatives were subject to more than one interpretation. The trial court apparently weighed the testimony of the experts and of the other witnesses and made a credibility call in plaintiff’s favor. We cannot say he was clearly wrong.
We find that the judgment of the trial court was correct for other reasons.
The stock purchase agreement expresses the following warranties:
1.

Sale of Stock

... Seller agrees to transfer ... to the Purchaser, ... 100% of the outstanding shares of capital stock of the Company, all of such shares to be free of liens and encumbrances of any nature, all of which shares of stock are owned by the Seller.
2.

Closing and Effective Date

A. ... At the Closing, the Seller shall deliver to the Purchaser, free and clear of *116 all encumbrances, certificates for all of the outstanding shares of the Company’s stock
3.

Seller’s Representations and Warranties

C. Ownership of Capital Stock of the Company. The Seller is the owner, free and clear of any encumbrances ... 223 shares of the Company’s outstanding stock, representing all of the issued and outstanding stock of the Company.
D. Absence of Undisclosed Liabilities; Financial Statements. As of the Balance Sheet date, July 31,1982, the Seller has no actual knowledge of any undisclosed liabilities of any nature, whether accrued, absolute, contingent or otherwise, against the Company which are not disclosed on the financial statements and which exceed $10,000 in the aggregate including, without implied limitation, all Federal, State, County and municipal tax liabilities due or to become due. The audited balance sheet of the Company as of July 31, 1982 and related statements ... do not omit to state any material liability (contingent or otherwise) or other fact necessary to be set forth therein to make such balance sheet and income statements not misleading ...
E. Tax Returns. The Company’s tax returns have been filed as required by law, and all taxes shown thereon have been paid when due
0. Accuracy of Statements. No representation or warranty of the Seller in this Agreement nor any document, statement, or certificate furnished or to be furnished to the Purchaser pursuant hereto or in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.
A fair reading of the entire document leads to the inescapable conclusion that Harvey was purchasing the stock with a clear understanding that the stock was free and clear of all liens and encumbrances of any nature. The income tax assessment would have matured into a lien against the assets of Harvey Press, Inc. had it not been paid prior to the lien being imposed. All of the representations made by the Seller that the shares of stock were free and clear of all liens would have been breached by the imposition of the tax lien, and Harvey would have been entitled to reimbursement of any amount paid to extinguish the tax assessment.
Section 3E warrants that the tax returns “have been filed as required by law, and all taxes shown thereon have been paid when due.” Appellant urges that this language merely asserts that the appropriate return was timely filed and payment made in accordance with the return, regardless of the correctness of the return and irrespective of future audits. We disagree.
The tax liability does not arise from the filing of the return but arises by operation of the income tax laws and regulations as applied to the income earned by the taxpayer during the reporting period. The return is merely the taxpayer’s declaration of its understanding of its tax obligation. Payment of the tax declared on the return may or may not be correct and is always subject to review, audit and assessment.
The words of a contract must be given their generally prevailing meaning. La.C.C. Art. 2047. Payment of taxes means the delivery of money to the I.R.S. for the purpose of extinguishing the tax obligation and results in the discharge of the tax debt. In other words, if the taxes have been paid the tax liability for the income reported on the return has been extinguished, discharged, closed, wiped-out and finished. This warranty was breached because the income tax obligation had not been discharged. The representation was, at best, mistaken, but, since it was unqualified, it did not depend upon Dixie’s actual knowledge or good faith, and it was unnecessary for plaintiff to prove actual knowledge in order to obtain judgment for breach of this warranty. Accordingly, if Dixie relied in good faith on its C.P.A. and was unaware of this tax liability exposure when the purchase agreement was signed, its good faith would not relieve it of liability.
*117 Finally, may the agreement be interpreted in such a way as to relieve Dixie of responsibility for this undisclosed or unknown liability, assuming, arguendo, that Dixie had no actual knowledge of the latent tax liability and was in good faith? We find no basis for such an interpretation.
Dixie offered testimony that it had no knowledge of the tax liability and had Section 3D reworded to include the actual knowledge language with regard to undisclosed liabilities. If Dixie had no knowledge that this tax matter was in dispute, the tax matter could not have been the basis for the language change. In fact, it is obvious from the testimony of Dixie’s attorney that the language change was inserted to protect Dixie from any liabilities that may have arisen from the actions of Harvey during the period when he was operating the business prior to the actual closing of the sale.
Dixie urges that the provisions of Sec. 3D and 3E, when read together, require the “actual knowledge” language of Sec. 3D to be superimposed on Sec. 3E. If we construe the language to be in conflict or ambiguous, the ambiguity must be construed against Dixie, the Seller. La.C.C. Art. 2474.
If we declare the provisions to be doubtful we must look to the nature of the contract, equity, usages and the conduct of the parties. La.C.C. Art. 2053.
Harvey testified that he was purchasing the stock with the understanding that all prior taxes had been paid. Harvey did not create the tax liability — it arose from the actions of Dixie and its related companies while Dixie owned Harvey Press. Equity dictates that the loss should fall upon Dixie, not upon the innocent purchaser.
The Seller failed to make provisions in the language of the contract to exonerate itself from responsibility if there was an undisclosed liability that exceeded $10,000 and of which the Seller had no actual knowledge. Nowhere in the contract does any language appear that declares: “and if there are any undisclosed liabilities in excess of $10,000 of which the Seller has no actual knowledge, the Seller shall be relieved from responsibility and the Buyer shall have no claim for indemnification in respect thereto.” Applying C.C. Art. 2054 to this fact situation we find that equity does not allow us to supply the missing verbiage to the contract in order to relieve Dixie of its responsibility.
The only way for Dixie to escape liability for this tax indebtedness would be to prove that Harvey had expressly waived the warranties which entitled him to reimbursement under the language of the contract and under the provisions of La.C.C. Art. 2476. We find no such language in the contract.
We further find that equity dictates that the absence of specific language waiving Harvey’s rights in warranty be construed against Dixie. Civil Code Arts. 2474, 2053 and 2054. Accordingly, we find that Harvey did not waive his rights to call Dixie in warranty for this undisclosed tax liability.
Plaintiff answered the appeal seeking an award of additional attorney’s fees. We decline to remand for this purpose. Appellee could have sought a rehearing at the trial level for the introduction of evidence and a ruling by the trial court. Absent the necessary evidence we are powerless to grant further relief.
For the foregoing reasons the judgment of the trial court is affirmed. Appellant is assessed for all costs of the trial and of this appeal.

AFFIRMED.

EXHIBIT “A”

STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT, entered into the 19th day of November, 1982, between Theo H. Harvey, Jr., a resident of Louisiana, hereinafter called “the Purchaser,” Dixie Graphics, Inc., a Tennessee corporation, hereinafter called “the Seller,” and Harvey Press, Inc., a Louisiana corporation, hereinafter called “the Company.”
WHEREAS, the Seller is the owner of all of the issued and outstanding shares of the capital stock of the Company; and
WHEREAS, the Seller is willing and desires to sell such stock, and the Purchaser is ready, willing and able to buy all of such *118 shares on the terms and subject to the obligations and conditions herein stated.
NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:
1.

SALE OF STOCK

Subject to the terms and conditions hereof, the Seller agrees to transfer and effectively convey and deliver at the Closing to the Purchaser, and the Purchaser will acquire from the Seller, 100% of the outstanding shares of capital stock of the Company, all of such shares to be free of liens and encumbrances of any nature, all of which shares of stock are owned by the Seller. In consideration for such shares, the Purchaser shall release a certain promissory note dated June 12, 1981 in the original principal amount of $1,500,000.00.
2.

CLOSING AND EFFECTIVE DATE

A.Subject to the fulfillment of all conditions and prerequisites set forth herein, the Closing shall take place in New Orleans, Louisiana, on the 19th day of November, 1982, or on such other date as may be mutually agreed upon between the parties. The sale will be effective as of the beginning of business on the first day of November, 1982. At the Closing, the Seller shall deliver to the Purchaser, free and clear of all encumbrances, certificates for all of the outstanding shares of the Company’s stock referred to in Paragraph 1 in negotiable form, and all of the corporate records of the Company in Seller’s possession. Upon such delivery, the Purchaser, subject to the terms and conditions set forth in this Purchase Agreement, shall release and deliver to the Seller the promissory note dated June 12, 1981 in the original principal amount of $1,500,000.00.
3.

SELLER’S REPRESENTATIONS AND WARRANTIES

The Seller represents and warrants to the Purchaser as follows:
A. Organization and Standing of the Company. The Company is, and will be at the Closing, a corporation duly organized, validly existing, and in good standing under the laws of the State of Louisiana and is duly and properly authorized and empowered to own its properties and to conduct its business in the places, and in the manner, in which its business is now, and will be on the Closing, conducted; the copies of the Company’s Certificate of Incorporation and all amendments thereof to date, certified by the Secretary of State of Louisiana, and of the Company’s By-Laws as amended to date, certified by the Company’s Secretary, which have been delivered to the Purchaser, are complete and correct as of the date of this Purchase Agreement.
B. The Capitalization of the Company. The Company’s issued and outstanding capital stock consists of 223 shares of common stock, all of which is owned by the Seller. All of the issued and outstanding shares of the Company’s shares of common stock have been duly authorized and are validly issued, fully paid and nonassessable. There are no existing options, calls or other commitments of any nature relating to the Company’s authorized or issued stock.
C. Ownership of Capital Stock of the Company. The Seller is the owner, free and clear of any encumbrances except for a pledge in favor of the Purchaser, of 223 shares of the Company’s oustanding stock, representing all of the issued and outstanding stock of the Company.
D. Absence of Undisclosed Liabilities: Financial Statements. As of the Balance Sheet date, July 31, 1982, the Seller has no actual knowledge of any undisclosed liabilities of any nature, whether accrued, absolute, contingent or otherwise, against the Company which are not disclosed on the financial statements and which exceed $10,000 in the aggregate including, without implied limitation, all Federal, State, County and municipal tax liabilities due or to become due. The audited balance sheet of the Company as of July 31, 1982 and related statements, prepared by Main Hurdman have been previously identified and have been delivered or will be delivered to Purchaser and, to the best of Seller’s knowledge, have been prepared in accordance with generally accepted account *119 ing principles applied on a consistent basis, correctly set forth the financial condition of the Company at the date of said balance sheet, and do not omit to state any material liability (contingent or otherwise) or other fact necessary to be set forth therein to make such balance sheet and income statements not misleading, and are attached hereto as Exhibit A.
E. Tax Returns. The Company’s tax returns have been filed as required by law, and all taxes shown thereon have been paid when due.
F. Absence of Certain Changes. Since July 31,1982, the Seller has no actual knowledge of (i) any change in the financial condition, assets, liabilities or business of the Company other than changes in the ordinary course of business, none of which has been materially adverse except for the sale of the finishing line and sale, replacement and refinancing of the Chromoscope and scanner; (ii) any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the property or busniess of the Company; (iii) any declaration of setting aside payment of any dividend or other distribution in respect of the capital stock of the Company, or any direct or indirect redemption purchase or other acquisition of such stock; (iv) any material increase in the compensation payable or to become payable by the Company to the director, officer, employee or agent, or any stock options, bonus payment or arrangement made to or with any of them, or any employee welfare, retirement or similar payment or arrangement made or agreed to by the Company except payments made pursuant to existing insurance plans; (v) any labor trouble; or (vi) any other event or condition of any character which has materially and adversely affected the business, properties or immediate prospects of the Company.
G. Labor and Employment Contracts. To the best of the Seller’s knowledge, the Company has complied with all applicable Federal, State and municipal laws regarding employment of labor, including the provisions therof relating to wages, hours, collective bargaining and the payment of Social Security taxes, and the Company as of July 31, 1982 was not liable for any arrears of wages or any tax or penalties for failure to comply with any of the foregoing.
H. Directors and Officers; Compensation; and Banks. The Company has delivered to Purchaser, marked for identification, a true and complete list showing (i) the names of all of the directors and officers of the Company.
I. Litigation. To the best of the Seller’s knowledge there is no litigation or proceeding pending or threatened against or relating to the Company, its properties or its business which might materially and adversely affect such properties or business, nor is any basis known to exist for any such action or for any governmental investigation relative to the Company, its properties or its business.
J. Eminent Domain. To the best of the Seller’s knowledge there are no eminent domain proceedings pending or threatened against any properties of the Company.
K. Court Orders, Decrees, Etc. To the best of the Seller’s knowledge there is no outstanding order, writ, injunction, or decree of any court, government agency or arbitration tribunal against or materially affecting the Company or its properties or business.
L. Compliance with Laws. To the best of the Seller’s knowledge the Company is in substantial compliance with all applicable laws, regulations and administrative orders of any state, municipality or sub-division of either to which it, its business, or its properties may be subject.
M. Execution and Performance of Purchase Agreement. The execution and performance by the Seller and the Company of this Purchase Agreement and the transactions contemplated hereby will not violate any provisions of, or result in the breach of, or constitute a default under, any law, or any order, writ, injunction or decree of any court, governmental agency or arbitration tribunal, or any contract, agreement, or instrument.
N. Corporate Records. The By-Laws, minute books and stock record book of the Company contain accurate, complete and correct copies of all such documents and of all minutes of meetings, resolutions and other *120 proceedings of the Board of Directors and shareholders of the Company, duly executed by the Secretary or an Assistant Secretary or by all directors or all shareholders, as may be appropriate, and shall be complete and accurate as of the Closing Date.
O. Accuracy of Statements. No representation or warranty of the Seller in this Agreement nor any document, statement, or certifícate furnished or to be furnished to the Purchaser pursuant hereto or in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained therein not misleading.
P. Absence of Illegal Payments. To the best of the Seller’s knowledge neither the Seller nor the Company has offered, paid or agreed to pay, directly or indirectly, any money or anything of value to any individual who is an official or employee of any governmental agency, either federal, state, county or municipal, or any agency or instrumentality for the purpose of inducing that individual to use his or her influence to obtain or maintain business or any other benefit of the Company, nor has the Company or the Seller made any political payment or contribution in convention of law.
Q. No Duty of Investigation. All of the foregoing warranties made by the Seller that relate to the knowledge of the Seller are made without specific investigation of the circumstances relating to such warranties, and the reference in such warranties to the knowledge of the Seller shall not be deemed to impose a duty upon the Seller to undertake such an investigation.
4.

PURCHASER’S REPRESENTATIONS AND WARRANTIES

The Purchaser hereby represents and warrants to the Seller that no change, whether by recharacterization, reclassification or otherwise, shall be made with respect to any item shown on the audited balance sheet of the Company as of July 31, 1982, and statements related thereto, prepared by Main Hurdman, Certified Public Accountants.
5.

CONDUCT OF BUSINESS OF THE COMPANY PENDING CLOSING

The Seller covenants that pending the Closing, except as otherwise consented to by the Purchaser:
A. The business of the Company will be conducted only in ordinary course;
B. No change will be made in the Certificate of Incorporation or By-Laws of the Company;
C. No change will be made in the authorized or issued capital stock of the Company;
D. No dividend or other distribution or payment shall be declared or made in respect of the capital stock of the Company;
E. No increase will be made in the compensation payable to or to become payable by the Company to any of its directors, officers, employees or agents, nor shall any stock options, bonus payments or other benefits be granted;
F. No contract or commitment will be entered into by or on behalf of the Company except in the ordinary course of business;
G. No indebtedness for borrowed money will be created, assumed or incurred by the Company.
H. No sale, transfer or other disposition, and no mortgage, pledge or other encumbrance, of any assets, will be made or entered into by or on behalf of the Company except in the ordinary course of business;
I. No change will be made with respect to the management and supervisory personnel or banking arrangements of the Company.
J. Company will use its best efforts to keep intact the organization of the Company, to keep available the services of its present officers and employees, and to preserve the good will of its suppliers, customers and others having business relations with the Company;
K. The Company will promptly file all required income tax returns and will promptly pay all federal, state and local tax assessments and governmental charges lawfully *121 levied or assessed upon it or upon its properties or upon any part thereof.
6.

ACCESS AND INFORMATION

The Seller warrants that the Company will permit the Purchaser, its counsel, accountants and other representatives to have full access, during normal business hours, throughout the period prior to the Closing, to all of the properties, books, leases, contracts, commitments and records of any and every kind of the Company and shall cause to be furnished to the Purchaser and its representatives during such period all such information concerning the affairs of the Company as the Purchaser or its representatives may reasonably request, and shall make available such personnel as the Purchaser may reasonably request for the furnishing of such information. The Purchaser hereby agrees that, following the Closing, it will give to the Seller and to its counsel and accountants, during normal business hours, full access to the Company’s books, records and other data delivered to the Purchaser to the extent that such access may reasonably be required to facilitate the preparation by the Seller of such tax returns as it may be required to file and the investigation, litigation and final disposition of any claims which may be made against the Company.
7.

CONDITIONS PRECEDENT TO PURCHASER’S OBLIGATIONS HEREUNDER

All obligations of the Purchaser and the Company to be discharged under this Purchase Agreement at the Closing are subject to the fulfillment, prior to or at the Closing, of each of the following conditions unless expressly waived in writing by the Purchaser at any time prior to the Closing:
A. Representations and Warranties True When Made. All of the representations and warranties made by the Seller in Paragraph 3 hereof shall be true as of the date of this Purchase Agreement.
B. Representations and Warranties True at Closing. The representations and warranties of Seller contained in this Purchase Agreement shall be deemed to have been made again at the time of Closing, and shall then be true in all material aspects; the Seller shall have caused all agreements and conditions required by this Purchase Agreement to be performed or complied with by him prior to or at the Closing to be so performed or complied with.
C. Opinion of Counsel. The Purchaser shall have been furnished with an opinion of Thomas J. Sherrard, attorney-at-law, in form and substance satisfactory to the Purchaser, dated the Closing, to the effect that:
(1) This Purchase Agreement has been duly executed and delivered by the Seller; and it constitutes the valid and binding obligation of the Seller in accordance with its terms.
(2) The Seller has complete and unrestricted power to sell, convey, transfer and deliver to the Purchaser at the Closing all of the capital stock of the Company to be vested in the Purchaser by virtue of this Purchase Agreement.
(3) The shares of the Company’s common stock delivered to the Purchaser and the Company by the Seller at the Closing hereunder are, to the best of counsel’s knowledge, free and clear of encumbrances except for the pledge in favor of the Purchaser, represent all of the outstanding shares of capital stock of the Company and are in the requisite negotiable form and with all requisite stock transfer stamps attached, to effectively transfer all of the Seller’s right, title and interest in such capital stock of the Company.
D. Supplemental Exhibits. The Seller shall have delivered to the Purchaser such supplements to the exhibits and other documents furnished to the Purchaser by the terms of this Purchase Agreement as may be necessary to reflect the changes required to -make such exhibits and documents accurate as of the Closing.
E. Permits and Approvals. The Seller has received all permits and approvals from any and all governmental agencies having jurisdiction which in the judgment of the Purchaser are necessary for the consumma *122 tion of the transactions contemplated by this Purchase Agreement.
8.

INDEMNIFICATION

Seller agrees to reimburse and save Purchaser and the Company harmless from any loss, costs or expense payable to or for the benefit of or asserted by any person, resulting from or arising out of, or incurred with respect any of the following:
A. Any and all damages or deficiencies resulting from any misrepresentation, breach of warranty, or nonfulfillment of any agreement on the part of the Seller under this Agreement or from any misrepresentations in or omission from any certificate or other instrument furnished or to be furnished to the Purchaser pursuant to this Agreement or in connection with the transactions contemplated hereby.
B. Any and all actions, suits, proceedings, demands, assessments, judgments, costs and expeneses incident to any of the foregoing; provided, however, that in the event any liability of the Seller shall arise under the terms of the indemnification granted hereby or by virtue of any warranty, representation or covenant stated or provided for under the terms of this Agreement, the Purchaser shall give to the Seller written notice thereof and the Seller will thereupon within 20 days following the receipt of such notice, either settle such liability or liabilities by joint action with the Purchaser, or undertake to defend such claim or claims jointly with the Purchaser. In the event of the failure of the Seller to undertake to settle or jointly defend against said liability or liabilities within the time specified, the Purchaser may settle said liability and the claim of the Purchaser against the Seller to the extent provided by the terms of this Agreement shall be conclusively established by such settlement.
C. Any and all actions, suits, proceedings, demands, assessments, judgments, costs and expenses relating to the Company’s involvement in any bankruptcy proceedings, including, without limitation, a certain Adversary Proceeding No. 381-0574 in the United States Bankruptcy Court for the Middle District of Tennessee, Nashville Division, in which the Trustee in Bankruptcy for H & S Transportation Company, Inc. has alleged that the assets of the Company should be applied to the bankruptcy estate to satisfy the creditors of the estate by virtue of the Company’s involvement in a certain cash account at Citizens Bank of Hendersonville, Tennessee, denominated as the “JWA Master Account;” provided that the Company, in consideration of the foregoing promise of indemnification, hereby assigns to the Seller all of the Company’s rights arising out of the aforesaid JWA Master Account or in anywise relating to the aforesaid bankruptcy proceeding or any other bankruptcy or reorganization proceedings relating thereto.
9.

SURVIVAL OF COVENANTS AND WARRANTIES

The representations, warranties and agreements made by the Seller, except as they may be fully performed prior to or contemporaneously with the Closing, shall survive the Closing and shall be fully enforceable at law or in equity by the Purchaser or the Company, their successors and assigns.
10.

MISCELLANEOUS

A. Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been fully given if delivered or mailed, first class, postage prepaid:
(a) If to the Purchaser to:
Theo H. Harvey, Jr.
Harvey Press, Inc.
3632 Desire Parkway
New Orleans, LA 70126
with a copy to:
Steven O. Medo, Jr.
Mars & Medo
210 Baronne Street
New Orleans, LA 70112
(b) If to the Seller to:
James R. Meadows, Jr.
Dixie Graphics, Inc.
P.O. Box 1290
Nashville, TN 37202
*123 with a copy to:
Thomas J. Sherrard
O’Hare, Sherrard & Roe
500 Church Street
Nashville, TN 37219
B. Amendments. This Purchase Agreement may be amended or modified by, and only by, a written instrument executed by the Purchaser, the Seller and the Company.
C. No Brokers. The Seller and the Purchaser agree that no third person has in any way brought the parties together or been instrumental in making this Purchase Agreement. Accordingly, the Seller and the Purchaser agree to indemnify each other against any claim by any third person for any commission, brokerage, finder’s fee or other payment.
D. Parties in Interest. This Purchase Agreement shall inure to the benefit of and be binding upon the Purchaser, the Seller, and the Company and their respective successors, heirs and assigns. This Purchase Agreement shall not be assigned by any party thereto except upon the written consent of the other parties. Nothing in this Purchase Agreement, express or implied, is intended to confer upon any other person any rights or remedies under or by reason of this Purchase Agreement.
IN WITNESS WHEREOF, the parties have duly executed this Purchase Agreement as of the day and year first above written.
SELLER:
DIXIE GRAPHICS, INC. By: [Signature]
PURCHASER:
/s/ Theo H. Harvey, Jr. Theo H. Harvey, Jr.
COMPANY:
HARVEY PRESS, INC. By: [Signature] President