887 So.2d 497 (2004)
Robert LEVIN
v.
Carlton MAY.
No. 2003 CA 2205.
Court of Appeal of Louisiana, First Circuit.
September 17, 2004.
*498 Craig D. Little, Lafayette, Counsel for Plaintiff/Appellant Robert Levin.
Mark W. Mercante, Mandeville, Counsel for Defendant/Appellee Carlton May.
Before: GUIDRY, GAIDRY, and McCLENDON, JJ.
GAIDRY, J.
The plaintiff-appellant, Robert Levin, appeals a partial summary judgment on the reconventional demand of the defendant-appellee, Carlton May, as well as an interlocutory judgment denying his motion for summary judgment. For the reasons expressed below, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
In August of 2002, Carlton May, a resident of St. Tammany Parish, read a newspaper advertisement for the sale of a business, Refill Technologies. He responded to the advertisement by contacting Robert Levin, the business owner. Mr. Levin informed Mr. May that the business involved the refurbishing and sale of printer cartridges, and operated in St. Tammany Parish and surrounding Northshore areas. Based upon the initial financial information provided, Mr. May felt the business opportunity had sufficient potential to justify entering into a preliminary agreement leading to eventual purchase of the business.
The parties first memorialized their agreement in a handwritten document, drafted by Mr. Levin, and dated and signed by both on August 28, 2002.[1] The initial agreement was refined later the same day in a more detailed, typed document entitled "Agreement to Sell Refill Technologies," also prepared by Mr. Levin and signed by both parties. In this second document, Mr. Levin agreed to sell "all of [his] interests in [his] business" to Mr. May for the sum of $90,000.00, upon Mr. May's completion of the following: payment of an initial deposit of $20,000.00 by September 4, 2002; Mr. May's verification of the business's "sales and profit figures"; and his completion of training in its operations over a maximum period of eight weeks. At the expiration of the training period, the balance of $70,000.00 of the sales price was to be paid, and all funds collected by the business in the interim between payment of the deposit and *499 the balance, as well as "any records, inventory or anything else pretaining [sic] to the operations and ownership "of the business would then be "turned over" to Mr. May by Mr. Levin. (Our emphasis.)
On September 4, 2002, the parties further refined their agreement in a detailed, seventeen-page typed contract prepared by Mr. May, which incorporated by reference the terms of the previous agreement and added more specific terms and provisions, including express warranties, representations, and suspensive conditions made by each party. The contract was styled as an "asset purchase agreement," ostensibly for the purpose of insulating Mr. May from any personal liabilities of Mr. Levin related to his operation of the business.[2] This final agreement (the "purchase agreement") provided that Mr. May would pay the initial "refundable" deposit of $20,000.00 on that date and that a "closing" would be held "on or before November 4, 2002," at which time Mr. Levin would sell and Mr. May would purchase "free and clear of all liens, encumbrances, claims, clouds, charges, equities or imperfections of any nature, ... [all] assets and properties owned or leased by [Mr. May] and used or useful in the Business or related operations." In that regard, it was expressly provided that Mr. Levin would execute and deliver necessary "bills of sale ... and other instruments of conveyance and transfer" at the time of the closing, at which time Mr. May would pay the balance of $70,000.00 due.
The final purchase agreement further provided that Mr. May as buyer was not assuming any obligations of Mr. Levin not expressly identified, and that Mr. Levin would give Mr. May and his representatives "full access" to the business's records and to provide all related information reasonably requested by them. Mr. Levin agreed to provide a complete balance sheet reflecting the business's financial condition on August 31, 2002, by September 20, 2002. Among the other detailed representations and warranties of the seller set forth in Section 8 were the following:
E. Except as otherwise disclosed by Seller in writing, as of the date of this Agreement, the assets and properties of Seller are not, and as of the Closing they will not be, subject to any liens, encumbrances, claims, clouds, charges, equities or imperfections of any nature.
* * *
N. On the date hereof Seller has, and on the Closing Seller shall have, duly prepared and timely filed all local, state and federal tax returns (including, without limitation, those which relate to FICA, withholding and other payroll taxes) required to be filed by such dates, and paid all taxes, penalties and interest with respect thereto. To the extent that any tax liabilities have accrued but not become payable, the full amounts thereof have been reflected as liabilities or reserved against on the Balance Sheet. After the Closing, Seller shall duly prepare and timely file any and all local, state and federal tax returns which pertain, in whole or in part, to the period on or before the Closing, and pay all taxes, penalties and interest with respect thereto.
Within a matter of days, Mr. May discovered what he considered were substantial inaccuracies in Mr. Levin's written representations, including the business's lack of licensing in St. Tammany Parish and its failure to remit sales taxes, despite *500 the fact that they were collected from customers. On September 6, 2002, he advised Mr. Levin (apparently verbally) that he wished to terminate the purchase agreement, requesting the return of his deposit. Mr. Levin refused to return the deposit, and filed suit against Mr. May on September 16, 2002, alleging breach of contract and consequential damages. Mr. May answered the petition, denying liability, and incorporated a reconventional demand, seeking the return of his deposit, as well as attorney's fees, costs, and expenses. Mr. Levin then filed a motion for summary judgment on his cause of action. Following a period of discovery, Mr. May moved for summary judgment on his reconventional demand.
Both motions were heard on February 19, 2003. By judgment signed on February 27, 2003, the trial court denied Mr. Levin's motion and granted Mr. May's motion, ordering the refund of his deposit and holding that he was entitled to indemnity, including costs and attorney's fees, but deferring the determination of the amounts due in indemnity to a later evidentiary hearing. From that judgment, Mr. Levin has brought this appeal.[3]

DISCUSSION
There is no genuine dispute regarding the material facts. The resolution of this appeal instead is dependent upon issues of law. In order to determine the law applicable to the facts, however, the character of the agreement must be confirmed by review of its terms and the facts evident from the record.
The described object of the original handwritten purchase agreement was "all of [Mr. Levin's] interest in `Refill Technologies.'" The second purchase agreement similarly described the property to be sold as "all of [Mr. Levin's] interests in [his] business, `Refill Technologies.'" Other language in that agreement provided that anything pertaining to the "operations and ownership" of Refill Technologies was to be delivered to Mr. May upon payment of the balance of the price and that the "ownership" of Refill Technologies was to revert to Mr. Levin in the event of Mr. May's default in such payment. These provisions are indicative of the parties' initial intent that the business enterprise itself was to be transferred.
*501 Review of the terms of the final purchase agreement demonstrates that the original intent did not change. The final purchase agreement specifically included "goodwill" within the assets to be sold in Section 1, "Transfer of Assets," and in Section 4, "Allocation of Purchase Price," Mr. Levin allocated $85,000.00 of the purchase price toward the value of the goodwill.[4] Section 7, reciting the terms of the closing, refers to "the transfer of the Business." Further, the inclusion of a non-competition covenant and a provision prohibiting use of the business's trade name by Mr. Levin reinforce this conclusion. Finally, Mr. Levin's receipt acknowledging the deposit of $20,000.00 paid by Mr. May describes it as "a refundable deposit towards the purchase of Refill Technologies." Of particular importance is the description of the assets as "free and clear of all liens, encumbrances, claims, clouds, charges, equities or imperfections of any nature" in Section 1.
Despite Mr. Levin's repeated characterization in his pleadings and briefs of the parties' agreement as a "sale," involving the "purchase" of assets by Mr. May, the agreement was clearly not intended to constitute a consummated sale. The final purchase agreement unequivocally stated that the assets would be sold and conveyed to the buyer "[a]t the Closing." Both parties concede in brief that the final closing of the sale of the business was contingent upon the completion of a "due diligence" investigation by Mr. May regarding Refill Technologies. This is confirmed by Mr. Levin's agreement in Section 6, "Further Assurances," to provide Mr. May and his "representatives, auditors and counsel" with "full access" to all of the business's books, records, and other documents between the date of the agreement and the closing date.
In the area of commercial transactions, the term "due diligence" has acquired the status of a term of art, with similar but subtly different definitions for different transactions, dependent upon their context.[5] Although it is a broad term, in the context of commercial business acquisition "due diligence" may briefly be defined as "the inspection and investigation of ... a business entity before a buyer makes the final decision whether to consummate an acquisition." Andrew N. Jacobson, A Narrative Real Estate Acquisition Due Diligence Checklist, 17 No.6 Prac. Real Est. Law. 7 (2001). More precisely, it is "the point in the transaction at which the seller of the business must demonstrate that the representations and warranties made in *502 the course of the negotiations are supported in fact, and the point at which the buyer ... must test [his] assumptions about the seller and its business." Robert D. Frawley, Due Diligence  The Crucible, 218-DEC N.J. Law. 47 (2002). As the previous writer has explained, "[t]he goal of any due diligence investigation from the buyer's perspective is to fully understand the seller's business, its markets, customers, financial condition, legal position, and any other risks or uncertainties inherent in acquiring and operating the business." Id.[6]
We begin our analysis of the applicable Louisiana law with the basic propositions set forth in La. C.C. art.1983:
Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith.
The requisite consent for an enforceable contract may be vitiated by error on the part of one or both parties to the contract. La. C.C. art.1948. Louisiana Civil Code article 1949 explains the type of error sufficient to vitiate consent:
Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party.
As to the subject matter of the error, La. C.C. art.1950 states the following:
Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation.
Louisiana Civil Code article 2013 sets forth the general rules relating to dissolution of a contract for nonperformance:
When the obligor fails to perform, the obligee has a right to the judicial dissolution of the contract or, according to the circumstances, to regard the contract as dissolved. In either case, the obligee may recover damages.
In an action involving judicial dissolution, the obligor who failed to perform may be granted, according to the circumstances, an additional time to perform.
Louisiana Civil Code article 2014 provides that "[a] contract may not be dissolved when the obligor has rendered a substantial part of the performance and the part not rendered does not substantially impair the interest of the obligee." According to the official Comments, this article "prevents a party from receding from a contract on a mere excuse." La. C.C. art.2014, Revision Comment (b) (1984). See, e.g., Rogers v. Restructure Petroleum Marketing Services, 01-1396, pp. 6-7 (La.App. 3rd Cir.3/6/02), 811 So.2d 1154, 1159.
Louisiana Civil Code article 2017 provides that "[t]he parties may expressly agree that the contract shall be dissolved for the failure to perform a particular obligation," either as of a specified time or upon notice by the obligee. Mr. May contends that the final paragraph of Section 7, relating to the closing, contains such an *503 express dissolution clause. Although we agree that Mr. May had the right to terminate the agreement, we choose to reach this result for other reasons, as the clause's application to the facts is less than clear.[7]
Mr. Levin contends that his failure to pay outstanding sales and license taxes was not a material breach of the agreement, as its terms allowed him until the closing date to pay any delinquent taxes and related penalties and interest, and that Mr. May put forth that omission and other alleged misrepresentations as mere excuses for a case of "buyer's remorse." We initially disagree with his interpretation of the scope of the grace period provided by the pertinent provision. The payment due by the closing date was clearly the payment of those taxes incurred in the interim between the agreement date and the closing date. We further disagree that the failure to have paid the past due sales taxes was not a material breach of the representations made.
The broad concept of due diligence has been described as being composed of four principal types, including financial, business, legal, and environmental. Frawley, supra, at 48. As the foregoing writer has emphasized, "[f]inancial due diligence includes confirmation that all taxes which are due and payable have been paid." (Our emphasis.) Id. at 49.[8] As Mr. May has correctly observed, the failure to timely pay state and local sales taxes subjects the property of the business to privileges for the amounts of the unpaid taxes, as well as the amounts of penalties. See La. R.S. 47:1577; St. Tammany Parish Ordinance 12-170.108. In Harvey v. Dixie Graphics, Inc., 628 So.2d 113, 115-16 (La.App. 4th Cir.1993), writ denied, 634 So.2d 380 (La.1994), it was held that express warranties in a stock purchase agreement that the shares were "free and clear of all encumbrances of any nature" and that the business's tax returns had "been filed as required by law, and all taxes shown thereon [had] been paid when due" were breached by the seller because its income tax liability had not been discharged. The court accordingly held that the buyer was entitled to be indemnified for the tax assessment and its costs for fees associated with discharging the debt. As in the present case, the purchase agreement also limited the scope of the seller's representations relating to business liabilities to "material" liabilities.
We take note of this court's holding in Scogin v. Smith, 612 So.2d 739, 741 (La.App. 1st Cir.1992), that delinquent property taxes on immovable property did not constitute a redhibitory defect entitling the buyer to rescission of the sale. However, as we explained therein, a redhibitory defect refers to some "physical imperfection or deformity," rather than a legal privilege or lien. Id. In that case, the property was not adjudicated to the state for the sellers' *504 unpaid taxes until after the sale, and the buyer had the right to redeem the property and to seek indemnity from the sellers. Finding that such a breach of warranty amounted to only a partial eviction, we held that the buyer was not entitled to rescission "under the particular facts of [that] case." Id. at 742.
In the context of a purchase agreement such as the one at issue, containing numerous specific warranties and representations, error as to the thing sufficient to vitiate consent need not be equivalent to a redhibitory defect. The agreement at issue was not a sale; it was an agreement to buy, or a purchase agreement. The thing, the price, and the consent of the parties are requirements for the perfection of a sale. La. C.C. art. 2439. Although the "thing" and "price" elements of a sale existed, the final element, that of "consent" of the parties, did not. That consent was made contingent upon the fulfillment of the suspensive conditions (the "conditions precedent") and warranties expressed in the agreement. In acquisition agreements which contemplate the undertaking of due diligence, such as the purchase agreement at issue, it is generally recognized that the seller's representations fulfill a number of purposes, among them:
The sellers' representations provide a foundation for the buyer's right to terminate the acquisition before or at the closing. After signing the acquisition agreement and before the closing, the buyer usually continues its due diligence investigation of the target. Detailed sellers' representations give the buyer, on its subsequent discovery of bad facts, a right to "walk away" from the acquisition.
Maryann A. Waryjas and Katten M.Z. Roseman, Negotiating the Acquisition Agreement, 1349 PLI/Corp 353, 371 (2003).
Purchase agreements relating to the acquisition of businesses frequently include suspensive conditions, referred to in most jurisdictions other than Louisiana as "conditions precedent," which must come into being before buyers are obligated to consummate business acquisitions. The potential consequences of failure of one of the suspensive conditions in such a purchase agreement are similar to those for the breach of an express representation by the seller: "If any one of the conditions is not satisfied as of the scheduled closing date, the buyer may decline to proceed with the acquisition (without incurring liability to the sellers) and may exercise its `walk away' right and terminate the acquisition agreement." Id. at 378. Although these conditions are similar to representations and covenants, in that every representation or covenant on the part of the seller normally constitutes a condition, the converse is not true. Id. at 379. By qualifying the buyer's right to refuse to consummate the acquisition to "material" breaches of representations and warranties, a condition based upon accuracy of prior representations "prevents the buyer from using a trivial breach of the sellers' representations as an excuse for terminating the acquisition." Id.
Although the foregoing authority does not rely upon Louisiana law, our law is fully in accord with the principles stated. The cause of the purchase agreement at issue was the eventual transfer of a viable and profitable business enterprise, with a minimum of difficulty associated with the change in ownership and management. The warranties and representations made by Mr. Levin were made "material" by the very nature of the purchase agreement, which required a due diligence investigation by Mr. May, and the breach of the significant express warranties at issue can only be deemed material. Mr. May was thus laboring under an error concerning a *505 "substantial quality" of the object of the agreement, the business, based upon material breaches of express warranties, and such error vitiated his consent. See Adler v. Parkerson, 581 So.2d 1073, 1076 (La.App. 5th Cir.1991), writ denied, 586 So.2d 538 (La.1991), and Clary v. D'Agostino, 95-0447, p. 3 (La.App. 1st Cir.12/15/95), 665 So.2d 792, 794.
In the case of a purchase agreement preliminary to an actual sale, it is only reasonable for either party to have the benefit of "walk away" rights should his expectations or understanding of an important quality of the object of the agreement be in error, particularly if founded upon inaccurate representations or unmet conditions. The purchase agreement at issue is comparable in its purpose to a purchase agreement for immovable property, which is generally held unenforceable against the prospective buyer in the event the seller cannot deliver a merchantable title. See, e.g., Lake Forest, Inc. v. Bon Marche Homes, Inc., 410 So.2d 362, 364 (La.App. 4th Cir.1982). As was noted by this court in Buzbee v. Fidelity National Bank, 492 So.2d 15, 21 (La.App. 1st Cir.1986), writs denied, 496 So.2d 1033 (La.1986), "[t]he question of merchantability of title arises frequently in the context of purchase agreements, where the buyer will not close a sale because the seller cannot deliver a satisfactory title." (Our emphasis.) Merchantability of title as grounds for termination of a purchase agreement has also been held applicable to a purchase agreement for the acquisition of a business, not involving only movable property. Lavenia v. National Business Consultants, Inc., 425 So.2d 840, 843-44 (La.App. 5th Cir.1983), writ denied, 432 So.2d 269 (La.1983).
We further observe that the purchase agreement at issue is very similar to the type of contract, a sale "on approval," envisioned by La. C.C. art. 2460, which provides:
When the buyer has reserved the view or trial of the thing, ownership is not transferred from the seller to the buyer until the latter gives his approval of the thing.
Under this article, it is expected that the buyer's view or trial of the thing will be conducted in good faith, and he "may not reject the thing arbitrarily." La. C.C. art. 2460, Comment (b), Revision Comments  1993. Like the due diligence investigation in the purchase agreement here, the buyer's view or trial in a sale "on approval" is a suspensive condition upon which the consummation of the sale depends. See Chartres Corporation v. Honeycutt, 342 So.2d 1251, 1253 (La.App. 4th Cir.1977), writ denied, 345 So.2d 59 (La.1977).
Although the purchase agreement at issue was not a sale "on approval," the manifest intent of the parties was to achieve the same result in the event of a good faith disapproval by the buyer based upon his due diligence investigation. Here, Mr. May was clearly within his rights to put Mr. Levin in default and to withdraw from the purchase agreement, and did so in the exercise of the due diligence investigation contemplated by the purchase agreement itself. The purchase agreement constituted the law between the parties, and its terms should be enforced according to their plain meaning.

DECREE
The judgment of the trial court in favor of the defendant-appellee, Carlton May, and against the plaintiff-appellant, Robert Levin, is affirmed. All costs of this appeal are assessed to the plaintiff-appellant, Robert Levin.
AFFIRMED.
*506 GUIDRY, J., concurs in the result.
McClendon, J., concurs.
NOTES
[1] The initial handwritten agreement, apparently intended as a "letter of understanding," simply provided:

Robert Levin agrees to sell all of his interests in "Refill Technologies" to Carlton May for the sum of $90,000.00. A contract for a deposit of $20,000.00 will be written and signed by Wednesday [,] September 5, 2002 and the deposit is to be paid by that date contigent [sic] upon verification of the sales figures provided.
[2] This practice is not uncommon in business acquisitions. Stuart M. Litwin, Drafting Acquisition Agreements, 913S PLI/Corp 7, 13-14 (1996). But as will be seen, it is not always effective in accomplishing its intended purpose.
[3] Appellate courts have the duty to examine their subject matter jurisdiction sua sponte, even when the parties do not raise the issue. Motorola, Inc. v. Associated Indemnity Corporation, 02-1351, p. 5 (La.App. 1st Cir.10/22/03), 867 So.2d 723, 725. A judgment that determines the merits in whole or part is a final judgment capable of being appealed. La. C.C.P. arts. 1841, 2083. But whether a partial judgment is properly appealable must be determined by reference to the requirements of La. C.C.P. art.1915. The judgment at issue is determinative of the merits of Mr. Levin's action and the principal issue of Mr. May's reconventional demand, even though it does not formally dismiss Mr. Levin's action. As Mr. May's ancillary claim of attorney fees was not adjudicated, however, the judgment at issue must be considered a partial summary judgment. Recognizing the partial character of its judgment, the trial court expressly designated it as a final judgment for purposes of immediate appeal, pursuant to La. C.C.P. art. 1915(B). However, the trial court did not articulate its reasons for doing so. Under the procedure set forth by this court in Motorola, Inc. v. Associated Indemnity Corporation, 02-1351, pp. 16-17 (La.App. 1st Cir.10/22/03), 867 So.2d 723, 732, the appellate court is required to conduct a de novo review of the propriety of the trial court's certification of a partial judgment, if no reasons are expressed or if the reasons are otherwise not apparent. As the judgment at issue is essentially determinative of all issues other than the amounts properly recoverable in indemnity, and the determination of that remaining issue will not affect the judgment at issue, the reasons for certification are apparent, and we find no abuse of discretion by the trial court in the certification of the judgment.
[4] Goodwill has been recognized in our jurisprudence as "an incidental property right connected with [a commercial] business and capable of sale and transfer from one owner to the other." Godwin v. Godwin, 533 So.2d 1009, 1010 (La.App. 1st Cir.1988), writ denied, 537 So.2d 1165 (La.1989), citing Ballero v. Heslin, 128 So.2d 453, 455 (La.App. 4th Cir.1961). Specifically, goodwill is defined as "the probability that the customers of the old establishment will continue their patronage." Id.
[5] The concept of "due diligence," as presently used in the business world, owes much of its development, if not its genesis, to federal securities legislation under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), the corresponding Securities and Exchange Commission Rule 10b-5, and the seminal case of J.I. Case Company v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), which first recognized a private cause of action for damages for violation of the securities laws. The federal courts subsequently established a showing of "due diligence" as a prerequisite for a plaintiff's recovery of damages in a Rule 10b-5 action, drawing an analogy from comparative fault in tort law. See Clement A. Evans & Company v. McAlpine, 434 F.2d 100, 104 (5th Cir.1970), cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153; Dupuy v. Dupuy, 551 F.2d 1005, 1017-19 (5th Cir.1977).
[6] Stated somewhat differently, "[t]he purpose of due diligence in the context of a proposed acquisition transaction is to provide the potential acquiror with sufficient information regarding the target company so that the acquiror may make a reasoned decision as to whether or not to pursue such a transaction...." David A. Katz, Due Diligence in Acquisition Transactions, 1368 PLI/Corp 271 (2003). See, e.g., Harvey v. Dixie Graphics, Inc., 628 So.2d 113, 123 (La.App. 4th Cir.1993) (dissenting opinion).
[7] The clause at issue reads:

In the event that the Closing hereunder shall not be consummated on the date and time specified in this Section for any reason other than some act, omission or material breach by Buyer, this Agreement shall, at the sole option of Buyer, terminate. Any deposit previously paid by Buyer shall be promptly returned to Buyer and neither party hereto shall have any further obligation or liability to the other party hereto.
As Mr. May placed Mr. Levin in default within two days of the signing of the agreement on September 4, 2002, and the closing was still pending on or before November 4, 2002, Mr. May's right to invoke the benefit of this clause might be viewed as premature.
[8] See also Litwin, supra, n. 2, at 28. ("The buyer will want to verify that all tax returns have been filed by the target company and that all taxes have been paid or reserved for in the target's balance sheet.")