983 So.2d 257 (2008)
Lee Roy JOYNER, M.D., Plaintiff-Appellant
v.
Samuel F. LIPRIE, et al., Defendants-Appellees.
No. 43,233-CA.
Court of Appeal of Louisiana, Second Circuit.
May 7, 2008.
*258 Sedric E. Banks, Monroe, for Appellant Lee Roy Joyner, M.D.
Greenwald Law Firm by Joseph W. Greenwald, Shreveport, Ward & Condrey, L.L.C. by Joseph R. Ward, Jr., Covington, McLeod Verlander by David E. Verlander, III, Monroe, for Appellees Gerald J. Daigle, Jr., Stephen Stull, Crichton Brown, Advantage Capital Corp. and Advantage Capital Partners II Limited Partnership.
Borne & Wilkes, L.L.P. by Keith M. Borne, Lafayette, for Appellees Samuel F. Liprie, Angiorad Ltd. and Mark Harrison.
Abbott Simses & Kuchler, APLC by Lawrence E. Abbott, Amy L. Maccherone, New Orleans, for Appellee Tyco International.
Hudson, Potts & Bernstein, William C. Henry, Monroe, for Appellee United States Surgical Corp.
Vinson & Elkins, L.L.P. by D. Ferguson McNiel, Shotwell, Brown & Sperry by George M. Wear, Jr., Monroe, for Appellees Interventional Therapies and Leon C. Hirsch.
Before STEWART, CARAWAY and DREW, JJ.
STEWART, J.
This is an appeal by the plaintiff, Lee Roy Joyner, M.D., from a judgment dismissing his claims against the defendants, United States Surgical Corporation ("Surgical") and Tyco International, Ltd., ("Tyco"). Joyner argues that the trial court erred in finding that his petition fails to state causes of action for fraud, conspiracy *259 and conversion against these defendants, that his claims are prescribed, and that Surgical is entitled to summary judgment on the basis that it owed no duty to him. Because we find the exceptions of no cause of action were properly granted, we affirm.

FACTS
In 1994, Joyner became involved in a business venture with Dr. Mark Harrison and Sam Liprie, a nuclear pharmacist and inventor who held a number of patents related to the use of radiological wires to treat blockages in the human body.[1] Liprie became interested in exploring the potential of a heart catheterization system using radioactivity known as intracoronary radiation therapy ("ICRT") to prevent restenosis following angioplasty. The three men, who were business associates in the medical field and friends, had an oral agreement to develop and market ICRT under the name Angiorad. They agreed to share ownership and profits with Liprie owning a 50% interest in the venture and Harrison and Joyner each owning a 25% interest.
During the summer of 1994, the group conducted human trials of ICRT in Caracas, Venezuela with the help of cardiologists in that country. The trials were a success. A medical abstract detailing the human trials and procedure was accepted for peer review and presentation before the American College of Cardiology at a convention in New Orleans to be held March 19-22, 1995.
On March 10, 1995, Joyner received a letter from Arthur Berner, an attorney representing Liprie. The letter informed Joyner that Liprie was planning to form a corporation, Angiorad, Inc., and that he would grant the corporation "a world wide exclusive license to use for intracoronary radiation therapy the concepts, technology and equipment covered by Patent Application Numbers 08/220,681, 08/257,045, and 08/316,500." Liprie offered to sell Joyner 50 shares, equal to 5% of the stock in Angiorad, Inc., in consideration of the money that Joyner had already paid and for an additional $180,000.[2] The letter stated that the offer would remain open until March 14, 1995. The letter also indicated that Harrison had agreed to the offer. Joyner did not.
On March 14, 1995, Berner faxed a second letter to Joyner on behalf of Liprie. This letter withdrew the offer of March 10, 1995, and advised Joyner not to represent himself as involved with Angiorad.
Joyner filed suit against Liprie, Arthur Berner, Berner's law firm, and "Angiorad, Ltd." on February 8, 1996.[3] In short, Joyner alleged that Angiorad, Ltd., was a closely-held corporation formed by himself, Harrison, and Liprie in 1993, and that Liprie and his attorney, Berner, forced him out of the corporation by improper actions.
*260 The claims against Surgical arose on September 6, 1996, when Surgical entered an agreement (hereafter "the License Agreement") with a Louisiana limited liability company referred to as Angiorad, L.L.C., Liprie, and Rads-S.L., Inc., a Louisiana corporation, to license "all of Angiorad's rights in, to and under the Technical License Agreement." The "Technical License Agreement" was a prior agreement entered on October 16, 1995, by which Liprie licensed to Angiorad, L.L.C., the rights, including his patent rights and other technical information, related to the restenosis treatment method.
When Liprie entered the License Agreement with Surgical, he was already involved in litigation with Joyner over this matter and the Omnitron stock dispute, and he had filed suit in Texas against Omnitron regarding his patent rights. The License Agreement referenced both the Texas "Omnitron Litigation" and the "Joyner Litigation," which included both suits brought by Joyner against Liprie. Article 13 of the License Agreement provided:
(d) [T]here is no claim, [a]ction or investigation pending or currently threatened against it which, if adversely determined, would restrict or limit their right to enter into this Agreement, transfer the rights or carry out their respective obligations under this Agreement, other than (i) the Omnitron Litigation, and (ii) the Joyner litigation.
Also, Article 7 of the License Agreement provided for indemnification obligations on the part of Surgical, but this provision explicitly excluded the Joyner litigation, the Omnitron litigation, or any patent infringement litigation. Though Surgical did reserve the right to, with notice, take responsibility for conducting the Omnitron litigation and enter into a settlement of the matter, no similar provision was made for the Joyner litigation.
On March 17, 1998, Joyner filed a "First Supplemental Petition" naming Harrison and Surgical as defendants. Joyner alleged that Harrison and Liprie sold to Surgical a corporation known as "Angiorad" as well as all the "assets, rights, work product information and other assets which had been utilized . . . in forming the original Angiorad."[4] He further alleged that Surgical knew of his claims to an ownership interest in Angiorad and that it conspired with Liprie and Harrison to circumvent and acquire his interest in Angiorad. Joyner asserted that these defendants were solidarily liable to him. In a second supplemental petition, Joyner added Angiorad, Inc., and Angiorad, L.L.C., as defendants.
On October 1, 1998, Tyco purchased all the outstanding shares of Surgical, which became a wholly-owned subsidiary of Tyco. All employees of Surgical became employees of Tyco Healthcare Group. By letter dated July 30, 1999, Tyco Healthcare Group / Surgical informed Liprie that it was terminating the License Agreement effective August 31, 1999.
Six years later, on August 25, 2006, Joyner filed a third supplemental petition naming additional defendants, including Tyco.[5] His claims were based on the due *261 diligence conducted by Surgical prior to entering the License Agreement and by Tyco prior to acquiring Surgical. Joyner alleged that these defendants' due diligence efforts were inadequate in failing to recognize his ownership interest in Angiorad, and he alleged they conspired with Liprie to deprive him of his interest in Angiorad. Joyner further expounded upon his allegations in a restatement of his third supplemental petition filed on May 15, 2006.
In response to the claims against it, Surgical filed exceptions of prescription and no cause of action along with a motion for summary judgment. Tyco also filed exceptions of prescription and no cause of action. The exceptions and the motion for summary judgment were argued at a hearing on August 13, 2007, at which time the trial court ruled in the defendants' favor. The trial court found that Joyner had used a "scatter gun approach" to sue a large number of defendants when his dispute was with a more narrow group, namely those persons with whom he was involved when he was shut out of Angiorad in March 1995. According to the trial court, any injury to Joyner or conversion of his interest in Angiorad occurred in March 1995. Neither Surgical nor Tyco was involved thereafter in any conspiracy against Joyner. The trial court also found that neither Surgical nor Tyco owed Joyner any duty that would support a claim based on negligence or breach of fiduciary duty. Finally, the trial court determined that any claims against these two defendants had clearly prescribed. Judgment dismissing the claims against Surgical and Tyco was filed September 7, 2007, and this appeal by Joyner followed.

DISCUSSION
No Cause of Action
Joyner argues that the trial court erred in finding his allegations that Surgical and Tyco conspired with Liprie to fraudulently convert his ownership of Angiorad do not state a cause of action for fraud, conspiracy, or conversion.
The law applicable to exceptions of no cause of action was explained in Downs v. Hammett Properties, Inc., 39,568 (La.App. 2d Cir.4/6/05), 899 So.2d 792, 795 as follows:
The peremptory exception of no cause of action is designed to test the legal sufficiency of the petition by determining whether the particular plaintiff is afforded a remedy in law based on the facts alleged in the pleading. The exception is triable on the face of the petition and, for the purpose of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. In reviewing a trial court's ruling sustaining an exception of no cause of action, the appellate court . . . should conduct a de novo review because the exception raises a question of law and the trial court's decision is based only on the sufficiency of the petition. Simply stated, a petition should not be dismissed for failure to state a cause of action unless it appears beyond doubt that the plaintiff can prove no set of facts in support of any claim which would entitle him to relief. Every reasonable interpretation must be accorded the language of the petition in favor of maintaining its sufficiency and affording the plaintiff the opportunity of presenting evidence at trial.
*262 See also Industrial Companies, Inc. v. Durbin, XXXX-XXXX (La.1/28/03), 837 So.2d 1207.
In arguing that his pleadings state causes of action for fraud, conversion, and conspiracy, Joyner notes that his third restated supplemental petition uses the word "conspiracy" nine times, the word "fraud" and variations thereof 19 times, and the words "conversion" or "convert" seven times to refer to the intentional misconduct of Liprie, Surgical, and Tyco. However, the mere mention in a pleading of fraud, conversion, or conspiracy, no matter how many times repeated, does not alone suffice to state a cause of action. Rather, we must examine the facts pled to determine whether the law affords a remedy to the plaintiff.
Joyner cites Dual Drilling Co. v. Mills Equipment Investments, Inc., 98-0343 (La.12/1/98), 721 So.2d 853 and Gibbs v. Harris, 35,239 (La.App. 2d Cir.10/31/01), 799 So.2d 665, as the controlling law in support of his conversion claim. These cases recognize that a dispossessed owner of a corporeal movable has three actions available to enforce his rights of ownership: (1) the revendicatory action to recover the movable; (2) the action for unjust enrichment; and (3) the delictual action arising from an offense or quasi-offense. Id. The tort of conversion is grounded on the unlawful interference with the ownership or possession of a movable and is committed by the following actions: (1) acquisition of possession in an unauthorized manner; (2) removal of a chattel from one place to another with the intent to exercise control over it; (3) unauthorized transfer of possession of the chattel; (4) withholding possession from the owner; (5) alteration or destruction of the chattel; (6) improper use of the chattel; or (7) assertion of ownership over the chattel. Dual Drilling; supra.
Joyner also cites the following Louisiana Civil Code articles pertaining to fraud and conspiracy:
La. Civ. C. art. 1953
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
La. Civ. C. art. 2324 (in relevant part):
A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
Weaving the law on conversion with the articles on fraud and conspiracy, Joyner argues that Liprie, Surgical and Tyco are co-conspirators who fraudulently converted his ownership interest in Angiorad.
The threads of Joyner's argument unravel when the facts pled are examined to determine whether they afford him a remedy in law against these two defendants. With regard to Surgical, Joyner alleges that it performed a due diligence audit, which included inspection of the records and files of Liprie's attorney, Arthur Berner, and therefore either knew or should have known of the letters dated March 10 and March 14, 1995, referencing Joyner's interest in Angiorad. The due diligence audit would have also allowed Surgical to learn of the suit Joyner had filed against Liprie concerning the Angiorad dispute. Nevertheless, Surgical's due diligence audit remained "silent and inactive" as to Joyner's interest. Through the License Agreement, Surgical joined Liprie in converting Joyner's ownership interest, in violating his fiduciary duty to Joyner, and in defrauding Joyner of his Angiorad interest and revenues. In a nutshell, Joyner alleges that Surgical conducted a due diligence *263 audit, learned of his interest in Angiorad, and did nothing about it. The same basic allegations were leveled against Tyco in the pleadings.
In examining the 90-plus numbered paragraphs of Joyner's restated third amending petition, it is clear that any conversion of Joyner's alleged 25 percent interest in Angiorad occurred on March 14, 1995, when Liprie's attorney, Arthur Berner, notified Joyner by letter that the offer of March 11, 1995, was being withdrawn and that he was no longer to represent himself as being involved in Angiorad. Because the well-pleaded facts indicate that the termination of Joyner's interest in Angiorad occurred on March 14, 1995, nothing Surgical did or did not do in its due diligence at the time of the License Agreement affected Joyner's interest in Angiorad or constituted a tortious conversion of his property. The facts pled also fail to support the claim that Tyco's acquisition of Surgical in October 1998 constituted tortious conversion of Joyner's alleged ownership interest in Angiorad. Neither Tyco nor Surgical conspired with Liprie to convert Joyner's interest in Angiorad, because the facts pled in the petition show that the alleged conversion had already been accomplished by the time Surgical had any dealings with Liprie concerning the Angiorad technology and Tyco acquired Surgical.
Joyner relies on Dual Drilling, supra, as support for his argument that Surgical and Tyco, having learned of his claimed 25 percent interest in Angiorad through their performance of due diligence, should have taken some action in his favor.
In Dual Drilling, supra, two partners purchased an inoperative off-shore drilling rig from Dual Drilling and contracted with Southern Scrap Recycling to dismantle it and purchase the scrap metal. One of the partners met with a Southern Scrap employee at the shipyard to show him the rig to be dismantled. However, the partner mistakenly identified part of an adjacent rig, Rig 25, as part of Rig 16. When Southern Scrap began the job, it cut part of Rig 25 even though Dual Drilling, which also owned Rig 25, had painted "Do Not Cut" on three sides of it and a shipyard worker told Southern's employees that Rig 25 was not to be cut. Following trial, Southern Scrap and the partners who contracted with it were held liable in solido for conversion of Rig 25 as a result of its dismantling. The appellate court found that both parties exercised dominion and control over Rig 25 and interfered with Dual Drilling's property rights. The court explained that Southern Scrap should have realized from the painted notices on Rig 25 that it was not part of the job. Southern Scrap knew or should have known that the rig belonged to someone other than the partners it contracted with and should have acted to find the owner and prevent Rig 25's destruction.
In Gibbs v. Harris, supra, conversion occurred when a landlord removed a tenant's personal property without authorization and exercised control over the property by placing it in a storage facility.
Both Dual Drilling, supra, and Gibbs, supra, are distinguishable from the instant situation in that ownership of the property that was the subject of the cause of action for conversion was not at issue. Here, Joyner's claimed ownership interest in Angiorad is clearly at issue. Liprie, not Joyner, is the alleged owner of the patent rights which form the basis of the Angiorad technology. Joyner is not even alleged to be a member of Angiorad, L.L.C., the entity involved in the License Agreement with Surgical. Joyner's claim is that he owns a minority interest in some as yet undefined venture or business entity involved in developing technology based on *264 patents held by Liprie, and that Surgical and Tyco are liable for conversion of his interest through Surgical's licensing of the Angiorad technology and Tyco's acquisition of Surgical. However, the merits of Joyner's claim against Lipre regarding his ownership interest in Angiorad have not yet been determined. His claim of a 25 percent ownership in Angiorad remains at issue. The alleged facts do not support a cause of action for conversion against Surgical and Tyco, whose involvement with the Angiorad technology through the License Agreement with Liprie and Angiorad, L.L.C., occurred well after the occurrence of the March 1995 events. Joyner's dispute is with his former associates who cut him out of the Angiorad venture in March 1995.
We also find that the pleadings do not state a cause of action for fraud against Surgical or Tyco. A claim of fraud based on silence or suppression of the truth requires there to be a duty to speak or disclose information. Greene v. Gulf Coast Bank, 593 So.2d 630 (La.1992). No such duty was owed by Surgical to Joyner under the facts alleged in the pleadings. As explained in Levin v. May, 2003-2205 (La.App. 1st Cir.9/17/04), 887 So.2d 497, due diligence is a term of art in commercial transactions that refers to the inspections or investigations of a business entity prior to an acquisition. Due diligence allows the buyer to understand the business it is seeking to acquire and any risks associated with it. Id. In commercial transactions, due diligence is conducted by a business for its own benefit. At the time Surgical entered the License Agreement, it knew only that Joyner had sued Liprie over their prior Angiorad dealings and that he claimed a minority interest. While this might be a factor Surgical considered prior to contracting with Liprie to license the Angiorad technology, the existing litigation over Liprie's claim would not translate to a duty on the part of Surgical to deal with Liprie or recognize his alleged ownership of a minority interest. Similarly, there would be no duty on the part of Tyco with regard to Joyner simply by its acquisition of Surgical.
Also, the facts pled do not give rise to any fiduciary duty owed by Surgical or Tyco to Joyner, nor do they support the claim that these defendants conspired with Liprie to somehow breach a fiduciary duty he owed Joyner. Any fiduciary duty existing between Liprie and Joyner was breached prior to the License Agreement when the relationship between Liprie and Joyner was terminated in March 1995.
Having conducted a de novo review of the exceptions of no cause of action, we conclude as a matter of law that based on the allegations in the pleadings Joyner can prove no facts in support of his claims of conversion, fraud, and conspiracy against Surgical and Tyco which would entitle him to relief. For these reasons, Surgical's and Tyco's exceptions of no cause of action have merit and were properly granted.
Summary Judgment and Prescription
Though granting the exceptions of no cause of action in favor of Surgical and Tyco effectively disposes of this matter, for thoroughness we have also reviewed the exceptions of prescription and Surgical's motion for summary judgment. We find that Joyner's claims against Surgical and Tyco are prescribed and that summary judgment in favor of Surgical was proper. We also find no merit in Joyner's argument that the trial court rushed to judgment without allowing him to discover "spoiled" or "concealed" evidence that would have allowed him to defeat the exception of prescription and summary judgment. The record shows that counsel for Joyner conducted ample discovery that fully developed the pertinent issues and explored *265 much else with representatives of Surgical and Tyco.
As previously addressed, Surgical owed no duty to Joyner relating to the due diligence it conducted prior to entering the License Agreement. Joyner was not a party to the License Agreement. He was not associated with either Angiorad, L.L.C., or Rads-S.L., the entities who along with Liprie were principals to the License Agreement. Moreover, the damage, if any, to Joyner occurred on March 14, 1995, when Liprie terminated Joyner's involvement with Angiorad. Nothing Surgical did can be construed as conversion of property belonging to Joyner, fraud against Joyner, breach of a fiduciary duty owed Joyner, or conspiracy with Liprie against Joyner. Having reviewed the motion for summary judgment with supporting exhibits and Joyner's opposition we find that there is no genuine issue of material fact and that Surgical is entitled to summary judgment as a matter of law.
The claims asserted against Surgical on March 17, 1998, over a year after the date of the License Agreement, and against Tyco on August 25, 2005, over six years after Tyco purchased Surgical, appear prescribed on the face of the petition. Joyner argues that his claims against these two defendants relate back to the timely filed claim against Liprie. We disagree. Joyner's claims against Liprie arise from the termination of their business relationship on March 14, 1995, his claim against Surgical arises from the License Agreement of September 6, 1996, and his claim against Tyco arises from its purchase of Surgical in 1998. These are discrete occurrences that cannot be considered part of the same conduct, transaction or occurrence for purpose of finding that the amended pleadings relate back to the original filing.
Moreover, these distinct occurrences do not constitute a continuing tort as argued by Joyner. The continuing tort principle applies when tortious conduct and resulting damages are of a continuing nature. Louisiana AG Credit, PCA v. Livestock Producers, Inc., 42,072 (La.App. 2d Cir.4/4/07), 954 So.2d 883, writ denied, XXXX-XXXX (La.9/14/07), 963 So.2d 1001. It is the continuous, cumulative, and synergistic nature of the tortious conduct that makes it actionable. Id. Prescription does not begin until the last act occurs or the conduct stops. Id. Joyner's allegations are not of continuous, cumulative and synergistic conduct by Liprie, Surgical, and Tyco. Rather, the distinct acts that form the basis of their alleged liability do not fit under the continuing tort rubric.
Joyner also contends that prescription was interrupted against Surgical and Tyco, because they are co-conspirators with Liprie and solidarily liable to him. A solidary obligation is not presumed. Corbello v. Iowa Production, XXXX-XXXX (La.2/25/03), 850 So.2d 686. It arises from a clear expression of the parties' intent. Id. As previously addressed, Joyner's petition(s) does not support a cause of action based on conspiracy. As alleged, the damage to Joyner occurred when Liprie terminated their business relationship on March 14, 1995. Nothing Surgical or Tyco allegedly did or did not do in the years thereafter constitutes a conspiracy with Liprie to deprive Joyner of his property or to assist Liprie in breaching any fiduciary duty owed Joyner.
We find no merit to Joyner's argument that his claims against Surgical and Tyco have not prescribed.

CONCLUSION
For the reasons explained, we affirm the trial court's judgment dismissing the claims of Lee Roy Joyner, M.D., against United States Surgical Corporation and *266 Tyco International, Ltd. Costs of appeal are assessed against the appellant.
AFFIRMED.
NOTES
[1] The recitation of facts is based on the allegations of the petition and are not factual findings by this court on the nature or validity of any agreement among Joyner, Harrison, and Liprie with regard to Angiorad.
[2] Exhibits in the record indicate that Joyner and Harrison shared expenses, including a salary for Liprie, during the development and testing of the ICRT technology.
[3] In February 1996, Joyner filed another suit against Liprie concerning a 1993 transaction between them for the purchase of stock in Omnitron International, Inc., of which Liprie was a founder and director. Omnitron produced HDR afterloaders, a device used to deliver radiation treatment for cancer. A judgment in favor of Joyner was amended and affirmed in Joyner v. Liprie, 39,342 (La. App. 2d Cir.3/11/05), 896 So.2d 363.
[4] Although there are various entities with the name Angiorad referred to in the petition, the opinion's references to Joyner's claim of an interest in Angiorad does not refer to any particular entity. Rather, it refers to his claimed interest to a share in the overall Angiorad venture and technology, which he argues attaches to all subsequent entities formed by Liprie.
[5] The named defendants included Gerald J. Daigle, Jr.; Advantage Capital Corporation; Advantage Capital Partners II, Limited Partnership; Crichton W. Brown and Steven Stull; Sam Liprie and Mark Harrison; United States Surgical Corporation; Tyco International, Ltd.; Interventional Therapies, L.L.C.; Angiorad; and Leon Hirsch, d/b/a JHK Investments, L.L.C.