BARNES, J., for the Court:
¶ 1. A Claiborne County jury convicted Eboni White of manslaughter, and the trial judge sentenced her to a term of twenty years in the custody of the Mississippi Department of Corrections (MDOC). White now appeals to this Court, claiming the trial court erred in: refusing to dismiss her indictment based on certain improper influences on the grand jury; prohibiting her expert witness, Jeffrey Curtis, from giving his opinion at trial on the use of force in self-defense; refusing to instruct the jury on her theory of self-defense; and in not allowing her witness, Ricky Thompson, to testify because he was in the courtroom during Curtis’s testimony. Additionally, White challenges the weight and sufficiency of the evidence to support her conviction, and argues cumula-five error. This Court, however, finds no reversible error and affirms.
STATEMENT OF THE FACTS AND PROCEDURAL HISTORY
¶ 2. Eboni White and the victim, Danielle Newsome, were students at Alcorn State University and had been friends since high school. They lived in trailer homes across the street from one another in a trailer park near Lorman, Mississippi. White lived with other roommates, and Newsome lived with her four-year-old son, Daniel. White and Newsome had a “falling out” when Newsome accused White of failing to stop for her child’s school bus one morning at the end of October 2009. The bus picked Newsome’s child up every morning and took him to a Head Start program. White remembers the incident as follows. That morning she was taking a football player to practice. She backed out of her driveway and stopped behind the bus. The bus’s lights were on, but it had no stop sign; so White just went around the bus, to its left, and drove to Alcorn’s campus. Shortly after returning home, White heard banging at her door. It was Newsome, who wanted to know if White had gone around the school bus. White said yes. Newsome exclaimed, “You almost hit my f**king baby.” White responded that she came nowhere near the child. Newsome then threatened White: “If something happens to my baby, I[am] going to f**k you up.” White did not think much of Newsome’s threat until later when Newsome started a “campaign of harassment” against White. Newsome would call White a “b***h” every time she saw White. Additionally, Newsome told White the police were looking for her and her vehicle because of the bus incident.
¶ 3. Approximately one week after the bus incident, White filed a complaint with the Claiborne County Sheriffs Office over *246 Newsome’s harassment. Martha Lott, a dispatcher with the sheriffs office, filled out the complaint form for White. White stated that on November 1, 2009, New-some came to White’s trailer door and made threats because White had driven around the school bus. Further, every time White came home, Newsome was outside waiting for her, cursing and calling White names. While normally Lott would contact the law-enforcement deputies when a complaint was filed, this time she did not because White did not ask her to.
¶ 4. On the morning of November 12, 2009, at approximately 8:00 a.m., White had started her vehicle, but she had to return to her trailer with a case of beer her roommate had left in her vehicle, as she could not take it to school. She then heard banging at her door and Newsome threatening, “B***h, come outside. I’m going to get you. Come on. I know you are in there ... ain’t no way out. You’re going to see me today.” A neighbor also testified Newsome woke her by repeated yelling at White’s trailer something to the effect of: “B***h, I’m going to whoop your ass. B***h, come out of there” for approximately fifteen to twenty minutes. Another neighbor overheard the commotion and was so concerned she called the police. White stayed in the trailer for approximately an hour and one-half trying to avoid Newsome, missing a college calculus test at 9:00 a.m. White made numerous phone calls to her brother, mother, and father; however, she could not get in touch with them. White’s brother had dated Newsome; so White thought “he could talk to [Newsome] and figure out what was going on.” When White finally reached her father, he told her to forget about her calculus test and go immediately to the courthouse and file a restraining order. Also, he told her to bring home her handgun, which White had bought for safety during road trips, as the trips were concluded.
¶ 5. At some point, White exited her trailer, with the handgun in the pocket of her backpack, heading towards the driver’s door of her vehicle. Newsome came forward from her trailer across the highway, approached the driver’s door of White’s vehicle, and blocked White’s access to her vehicle. The two exchanged words in the common driveway off the highway, where White’s vehicle was parked. Witnesses recounted that New-some again stated, “You tried to hit my baby,” and asked White, “Why did you try to run over my child?” White told New-some they had “discussed this already” and to “chill out,” but Newsome responded, “No, f**k that. F**k that. We fixing to discuss it again.” White stated that as Newsome was approaching her, New-some’s hand came up, and there was something silver in it, which White thought was a weapon.[1] One eyewitness testified that White was cursing Newsome as well, calling her a “b***h” and stating she was “tired.” White then took her handgun from her backpack and shot Newsome several times. Law-enforcement officers arrived to hear gunshots and saw a crowd of people had gathered. Newsome fell to the ground. Officers told White to put the gun down, and she threw it towards them stating, ‘You can have it now.” As they were arresting White, someone said, “Ebo-ni, I told you to wait in the house. I told you to wait.” White, very upset, responded, ‘Y’all was taking too long ... [New-some] wouldn’t leave me alone.” New-some died from multiple gunshot wounds.
¶ 6. "White was indicted for murder. She filed a motion to dismiss the indictment for improper influence by the grand jury foreperson, who White claimed knew *247 and disliked her. The trial court denied the motion. A three-day trial ensued in September 2010.
¶ 7. At the trial, several of White’s and Newsome’s neighbors testified. One neighbor testified that on the morning of the shooting, he pulled up in his vehicle to where Newsome was standing, and she told him a young lady had tried to run over her child. The neighbor told New-some to “let it go” and return to her trailer. Newsome also tried to stop her child’s bus driver, who was coming through the trailer park at the time, and tell the driver that White had tried to run over her child. Newsome then approached one of White’s roommates who was outside. The roommate told Newsome she had nothing to do with the incident and to speak with White about it, and returned to her trailer.
¶ 8. Three neighbors testified they saw White shooting the gun. White, testifying on her own behalf, claimed she took the gun with her to take it home, on her father’s advice-not to shoot Newsome. Regarding the shooting, White claimed that she had witnessed Newsome’s capacity for violence in other prior instances, and felt she had to protect herself. Newsome’s autopsy showed a total of five gunshot wounds: one to the head, three to the torso, and one to the thigh. No weapons were found on Newsome’s body.
¶ 9. The jury found White guilty of the lesser-included offense of manslaughter. The trial judge sentenced her to twenty years in the custody of the MDOC. White’s motion for a judgment notwithstanding the verdict (JNOV) or a new trial was denied, and White appealed.
ANALYSIS OF THE ISSUES
I. Improper Influence by Grand Jury Foreperson
¶ 10. White asserts that the trial court erred in refusing to dismiss her indictment because of improper influence by the grand-jury foreperson, who White claims knew and disliked her. White argues that her conviction should be reversed and the indictment dismissed, or, in the alternative, she should receive a full hearing on the issue.
¶ 11. The sole inquiry an appellate court can make regarding grand-jury proceedings is “whether the grand jury was subjected to improper influences.” Culp v. State, 983 So.2d 264, 281 (¶ 59) (Miss.2005) (citing Hood v. State, 523 So.2d 302, 307 (Miss.1988)). “Absent evidence that a member of the grand jury acted with malice, hatred, or ill will, or fraud, or otherwise violated the oath taken by grand jurors, it is presumed that the grand jurors did not improperly or illegally act in returning the indictment against the accused.” Id. (citing Southward v. State, 293 So.2d 343, 344 (Miss.1974)). The factual determinations of the trial court are reviewed only for clear error. Conclusions of law are reviewed de novo. Id.
¶ 12. Prior to trial, White filed a motion to dismiss her indictment, where she alleged that the foreperson had been an employee at her high school when White was a senior. White claims she and the foreperson had a “serious verbal confrontation” during high school that resulted in White’s not being allowed entrance into an honor society. Additionally, White contends the foreperson was a personal acquaintance of Newsome, and is personal friends with the district attorney’s wife. The trial court denied the motion because White did not present sufficient evidence to overcome the presumption that the grand jury acted properly.
¶ 13. There is no evidence in the record that there was any improper influ *248 ence on the grand jury because of the relationships of the grand-jury foreperson with the victim and the district attorney, or because of the foreperson’s prior interaction with White. Furthermore, White failed to provide evidence of undue influence to the trial court. Allegations in a motion cannot be considered as proof of facts; the movant must support his motion with proof. Gordon v. State, 349 So.2d 554, 555 (Miss.1977). Absent such proof, there is a presumption in favor of the correctness of the trial court’s action. Id. Therefore, we cannot find the trial court’s denial of White’s motion to dismiss her indictment clearly erroneous. And, even if White had proven the allegations of her motion, there would be insufficient proof of undue influence, where malice, hatred, ill will, or fraud must be proven. The Mississippi Supreme Court requires that there must be “actual influence, not just the appearance of impropriety.” Culp, 933 So.2d at 282 (¶ 62) (citing Southward, 293 So.2d at 344).
¶ 14. White also complains that she did not receive an “extensive hearing” on the matter, as required by Culp. While there is no transcript in the record of a hearing, the court’s order indicates that a hearing on the motion did occur. The trial court noted that it found the evidence presented on the motion’s allegations insufficient. We find no error in this ruling.
II. White’s Expert Witness Jeffrey Curtis
¶ 15. White argues that the trial court erred in limiting the testimony of her expert witness, Jeffrey Curtis, who was to give an opinion on whether White used an appropriate level of force under the circumstances, and whether her actions were consistent with self-defense. The trial judge found this testimony would be improper, and did not allow Curtis to testify on this subject matter.
¶ 16. “[T]he admission of expert testimony is within the sound discretion of the trial judge.” Bishop v. State, 982 So.2d 371, 380 (¶ 33) (Miss.2008) (citing Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003)). The decision of the trial judge will stand “unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.” Id. (quoting McLe-more, 863 So.2d at 34 (¶4)). Mississippi Rule of Evidence 702 governs the admissibility of expert testimony and states:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Mississippi has adopted a modified Daubert standard for the trial court to perform when determining whether expert testimony is admissible under Rule 702. The analytical inquiry is two-pronged: whether the expert testimony is relevant — that is, it must assist the trier of fact; and whether the proffered testimony is reliable. McLemore, 863 So.2d at 36 (¶ 11). The Daubert factors include whether: the theory or technique can be and has been tested; it has been subjected to peer review and publication; the technique has a high known or potential rate of error; and the theory enjoys general acceptance within a relevant scientific community. Id. at 37 (¶ 13) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94, 113 *249 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). “The applicability of these factors depends on the nature of the issue, the expert’s particular expertise, and the subject of the testimony.” Id. (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).
¶ 17. The defense tendered Curtis as an expert witness in the field of firearms, use of force, and defensive tactics. During voir dire, Curtis stated he had been accepted as an expert in these fields by other courts several times. Defense counsel explained Curtis would be testifying that White did not exceed an appropriate level of force under the circumstances, in order to show White’s shooting the victim was consistent with her theory of self-defense. The trial judge, however, expressed skepticism that expert testimony on the use of force had been generally accepted by courts as a scientific field. Yet, the trial judge did acknowledge Mississippi Rule of Evidence 704, which states “testimony in the form of an opinion ... [that is] otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the [jury].” Counsel responded by offering several cases in support of her position, but the trial judge found them inapplicable here because the cases dealt with governmental entities and police officers, not private individuals.[2] The State accepted Curtis as an expert witness “with regard to weapons,” but objected to the defense soliciting Curtis’s opinion as to whether White acted in self-defense. The trial judge agreed with the State, finding the testimony on use-of-force and self-defense, in this instance, improper. The judge stated the expert was not in a better position than the jury to determine whether White was being reasonable in using deadly force. However, the trial judge found Curtis “eminently qualified in the field of training for firearms and combat.” Curtis’s testimony was ultimately limited to the caliber of White’s handgun.
¶ 18. In her brief, White cites to several police and ballistic journal articles about use-of-force to show the area is accepted as a scientific field. Yet, at trial, she did not offer any of these articles or any studies to justify why Curtis’s expert opinion would be of assistance to the jury, based on Daubert, and she cannot do it now. There is nothing to say Curtis’s opinion would be superior to that of a layman or juror’s opinion.
¶ 19. Therefore, we cannot find that the trial judge abused his discretion in limiting Curtis’s expert testimony. White did not established the expert testimony on the use of force as generally accepted by the scientific community, under Rule 702 and Daubert. Therefore, the trial judge correctly ruled that expert testimony regarding whether the defendant acted reasonably in shooting Newsome was improper.
III. Jury Instructions
¶ 20. White argues that the trial court erred in refusing to instruct the jury on her theory of the case on self-defense, which encompassed the “Castle Doctrine” and her right to use deadly force to repel a trespasser. White claims that these two instructions were justified because there was evidence at trial that before being *250 shot, Newsome was the aggressor and had unlawfully entered White’s premises, banged on White’s door, and announced her intent to assault White.[3]
¶ 21. It is well established that “jury instructions are within the discretion of the trial court.” Davis v. State, 18 So.3d 842, 847 (¶ 15) (Miss.2009). Further, jury instructions must be considered together, not in isolation. Rubenstein v. State, 941 So.2d 735, 784 (¶ 224) (Miss. 2006). “When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law.” Id. at 785 (¶ 224) (internal quotations and citations omitted). Additionally, “[a] defendant has a right to jury instructions that present his theory of the case, but that right is not absolute. ‘The court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions or is without foundation in the evidence.’” Davis, 18 So.3d at 847 (¶ 15) (quoting Phillipson v. State, 943 So.2d 670, 671 (¶ 6) (Miss.2006)).

A. The Castle Doctrine Jury Instruction

¶ 22. White first argues that the evidence supported her instruction D-12 on the Castle Doctrine presumption, which reads:
The court instructs the jury that a person who uses defensive forces shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon her or upon her dwelling, or against a vehicle which she was occupying, if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful forcible act was occurring or had occurred.
Therefore, if you find from the evidence in this case that the deceased, Danielle Newsome, had unlawfully and forcibly entered the property surrounding Eboni White’s residence, or that Danielle Newsome, the deceased, was in-the process of unlawfully and forcibly entering Eboni White’s residence or the property surrounding Eboni White’s residence, or Eboni White’s vehicle, and that Eboni White was aware that such forcible entry or unlawful act by Danielle Newsome was occurring or had occurred, then you shall presume Eboni White to have reasonably feared imminent death or great bodily harm at the time of the shooting, and you must, therefore, find the defendant, Eboni White, not guilty.
This instruction tracks the language of Mississippi Code Annotated section 97-3-15(3) (Rev. 2006), which along with Mississippi Code Annotated section 97-3-15(4) (Rev. 2006), is commonly known as the Castle Doctrine.[4] White complains that, *251 instead, the jury was given the State’s instruction S-9 about what constitutes a reasonable justification of force for assault with a deadly weapon.
¶ 23. The Castle Doctrine “creates a presumption of fear and abridges a duty to retreat in certain prescribed circumstances.” Newell v. State, 49 So.3d 66, 74 (¶ 22) (Miss.2010). Newell explains the Castle Doctrine includes two prongs:
First, under subsection (4), if the defendant is in a place where he had a right to be, is not the immediate provoker and aggressor, and is not engaged in unlawful activity, he has no duty to retreat before using defensive force. Miss.Code Ann. § 97-3-15(4) (Rev. 2006). And second, if the jury finds that any of the circumstances in subsection (3) are satisfied, the defendant who uses such defensive force is presumed to have reasonably feared imminent death or great bodily harm or the commission of a felony upon him. Miss.Code Ann. § 97-3-15(3) (Rev. 2006).
Id. White’s first argument on the refusal of instruction D-12 relates to the second prong; accordingly, we must determine if the evidence presented at trial entitles White to an instruction on this presumption.[5]
¶24. White and Newsome lived across the street (Highway 552) from one another. It is undisputed that Newsome was the initial aggressor when she first entered White’s immediate premises at approximately 8:00 a.m., “banging” on White’s trailer door and yelling obscenities and threats. But the two women had no interaction at that point — White did not go to the door. White stayed inside her trailer for approximately one hour after New-some’s tirade. During this time, one witness testified that Newsome was yelling obscenities from in front of her own trailer, across the highway, and White’s roommate stated Newsome was in the street “talking all that noise.” It was not until after 9:00 a.m. that White exited her trailer and headed towards her vehicle, which was parked approximately 200 to 300 feet from her trailer in a common driveway. This common driveway was an unpaved road that came off the highway and went in front of the trailers on that side of the *252 road. Newsome came from across the highway to confront White. White testified that Newsome came toward her, moving quickly, from the area near her roommate’s vehicle, which was “a good little distance” from White’s vehicle. Newsome met White near the driver’s door of White’s car. White testified that when Newsome came as close as her driver’s side tire, Newsome’s hand went up, and White fired her handgun several times.
¶ 25. While there were no other jury instructions given that tracked the language of the Castle Doctrine presumption, it was not warranted by the evidence presented at trial. Applying our facts to the requirements of section 97-3-15(3), there is nothing to show Newsome was performing or attempting the enumerated actions that would give rise to White having a “reasonable] fear [of] imminent death or great bodily harm,” thereby justifying defensive force, let alone deadly force. Specifically, there is no evidence to show New-some “unlawfully and forcibly ... entered” or was attempting to enter White’s trailer, vehicle, or “immediate premises thereof.” Nor had Newsome “removed” or was attempted to remove White from her dwelling, vehicle, or the “immediate premises thereof,” against her will.
¶ 26. When White and Newsome had their final confrontation, they were nowhere near White’s “dwelling,” but in the common driveway where White’s vehicle was parked. Additionally, White’s vehicle was actually parked in front of a trailer other than her own. Photographs entered into evidence show that after being shot, Newsome’s body lay between White’s vehicle and a utility pole, at the edge of the unpaved inlet to the common driveway. Her body was not even in front of White’s trailer, but another uninhabited one. Further, White was not occupying her vehicle at the time of the shooting. She had started her vehicle earlier when she retrieved the case of beer from it, but she then returned to her trailer. When White came out of her trailer approximately an hour later, she never reached her vehicle. From the testimony, photographs, and diagrams admitted at trial of the trailer park, White’s vehicle, and Newsome’s body, it cannot be said that Newsome was “unlawfully” in any location when she and White had their fatal confrontation. Nor does the evidence show Newsome had performed any “forcible” act in walking across the road to confront Wdiite. Further, there is no evidence that Newsome was attempting to remove White from her home or vehicle, which would justify White’s using defensive force under the Castle Doctrine. Newsome was unarmed.
¶ 27. White cites to Westbrook v. State, 29 So.3d 828 (Miss.Ct.App.2009), in support of her argument. In Westbrook, this Court affirmed a conviction for murder, where the defendant, a bouncer, went outside to the bar’s parking lot to confront a patron who had been asked to, and did, leave the bar a few minutes before. Id. at 831 (¶¶ 1-3). Although testimony conflicted about who initiated the fatal fight, one witness testified that the defendant pulled the victim out of his vehicle. Id. at (¶ 4). The defendant then struck the victim with a baseball bat, killing him. Id. at (¶¶ 4, 6). The defendant argued that his actions were justified under the Castle Doctrine, as he had a right to defend the bar’s property as its employee. Id. at 833 (¶ 13). However, this Court disagreed, citing Lester v. State, 862 So.2d 582, 585 (¶ 11) (Miss.Ct.App.2004)[6]: “The law contemplates, rather, that deadly force may only be employed to repel a trespasser who demonstrates the apparent purpose of *253 assaulting or offering violence to an occupant or committing some other crime on the premises.” Westbrook, 29 So.3d at 833 (¶ 14). There was no evidence the victim was going to assault anyone at the bar or commit another crime in the parking lot. Id. at (¶ 15). Further, under the Castle Doctrine, there was no evidence to show the victim “unlawfully and forcibly entered” the bar. Id.
¶ 28. Westbrook is instructive here because there was no evidence that at the time of the shooting, Newsome had “unlawfully and forcibly entered” the common driveway. Nor was there any evidence that she was trespassing in the common driveway, approximately two car lengths from the roadway. The evidence showed Newsome met White at her vehicle, unarmed, and stated: “What’s up Eboni? ... You tried to hit my baby.... We fixing to discuss it again.” Accordingly, the trial court did not err in denying jury instruction D-12 on the Castle Doctrine because there was no evidentiary basis for it under section 97-3-15(3).

B. The Right-to-Repel-Or-Trespasser Jury Instruction

¶ 29. White also argues that the trial court should have given jury instruction D-13 on the right to employ deadly force to repel a trespasser. The instruction reads:
The court instructs the jury that deadly force may be employed to repel a trespasser who demonstrates the apparent purpose of assaulting or offering violence to an occupant of a dwelling or committing some other crime on the premises.
Therefore, if you find from the evidence in this case, that on the morning of the shooting, the deceased, Danielle Newsome, was trespassing upon the property lawfully occupied by Eboni White, and that Danielle Newsome had there demonstrated the apparent purpose of assaulting or offering violence to Eboni White on such property, then you shall find the defendant, Eboni White, not guilty.
White cites to Lester in support of her argument.
¶ 30. In Lester, this Court affirmed the defendant’s conviction for murder. Lester, 862 So.2d at 583 (¶ 1). The defendant’s wife had allowed the victim, a male acquaintance, into the couple’s house to apologize after the defendant and victim had an altercation earlier in the evening. Id. at (¶ 2). After telling the victim repeatedly to leave, the defendant testified the victim physically attacked him; so he shot the victim. Id. at 584 (¶¶2-3). The defendant argued that he should have received a jury instruction on his right to defend his habitation; however, the trial court refused this instruction because it was adequately covered elsewhere. Id. at 585 (¶¶ 9-10). This Court agreed with the trial court, noting that the defendant was given an instruction on the right to repel a trespasser from his home, as well as standard instructions on self-defense. Id. at 586 (¶ 13).
¶ 31. This Court noted that the law on defense of habitation does not allow the premises owner to kill an individual “if he fails to leave the property soon enough to satisfy the desires of the owner.” Id. at 585 (¶ 11). Instead:
[Djeadly force may only be employed to repel a trespasser who demonstrates the apparent purpose of assaulting or offering violence to an occupant or committing some other crime on the premises. Bowen v. State, 164 Miss. 225, 227, 144 So. 230, 232 (1932).... [T]he threat of serious bodily injury need not be as imminent in defense of habitation as in a case of individual self-defense. Thus, if *254 it appears reasonable for the occupant to conclude that the ultimate purpose of the trespasser is to inflict such harm, then, because of the law’s recognition of the sanctity of one’s own residence, deadly force may be employed to end the potential danger at a stage before the actual threat becomes immediate. Id.
Id. at 585-86 (¶ 11).
¶ 32. The facts of Lester are readily distinguishable from this case. There is no evidence that, at the time of the shooting, Newsome was trespassing. And there is no evidence that Newsome did not have the right to be in the common driveway, in front of the trailer that was next to White’s, and approximately two car lengths from the highway. Newsome may even have been in the highway right-of-way, as her body fell between the highway and the utility pole.
¶ 33. Finally, White also appears to make the argument that she should have been given a jury instruction on justifiable homicide because she cites to the relevant statutory subsections (e) and (f) of Mississippi Code Annotated section 97-3-15(1) (Rev. 2006) in her brief during her discussion of the Castle Doctrine; however, she does not cite any specific instruction on that theory offered at trial and refused by the trial court. From the record, it appears that defense instruction D-2 tracked the language of justifiable homicide in section 97 — 3—15(1) (f), but it was withdrawn by defense counsel. “A trial judge will not be found in error on a matter not presented to him for decision.” Howard v. State, 945 So.2d 326, 360-61 (¶ 71) (Miss.2006) (quoting Smith v. State, 729 So.2d 1191, 1205-06 (¶ 63) (Miss.1998)). Thus, the issue is waived.
¶ 34. In conclusion, a total of five jury instructions were given relating to White’s theory of self-defense — two from the State and three from the defense. From the evidence presented at trial, however, we cannot say that jury instructions on the Castle Doctrine and the right to repel a trespasser were warranted. Also, White’s theory of her case was fairly covered in other instructions. Therefore, we find the trial court did not abuse its discretion in refusing jury instructions D-12 and D-13.
IV. The Exclusion of White’s Witness Ricky Thompson
¶ 35. White next argues that one of her witnesses, Ricky Thompson, was improperly excluded from testifying. At the beginning of the trial, the rule of sequestration was invoked by both parties. In a proffer, defense counsel explained that Thompson, who was near the scene of the shooting, would have testified for the defense about what he saw and heard during the shooting. However, the prosecution noted Thompson had been in the courtroom during the testimony of White’s expert witness, Curtis. For this reason, the prosecution objected to Thompson testifying. The trial court sustained the objection. This ruling, White claims, violated her state and federal constitutional right to call witnesses, and requires a new trial.
¶ 36. Mississippi Rule of Evidence 615 governs witness sequestration. It provides:
At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be *255 essential to the presentation of his cause.
M.R.E. 615. “The purpose of the rule is to prevent a witness from adapting his/her testimony to previous testimony.” Kiker v. State, 919 So.2d 190, 194 (¶ 8) (Miss.Ct. App.2005) (citing Douglas v. State, 525 So.2d 1312, 1316 (Miss.1988)). The appellate court is limited to an abuse-of-diseretion standard when reviewing an alleged sequestration violation. Whittington v. State, 748 So.2d 716, 719 (¶ 19) (Miss.1999). q“Reversal is not justified unless there is a showing of prejudice sufficient to constitute abuse of discretion on the part of the trial judge in not ordering a mistrial or not excluding testimony.” Id. (citing Douglas, 525 So.2d at 1318). When a witness has violated the rule, the trial court has discretion as to the proper remedy. Finley v. State, 725 So.2d 226, 233 (¶ 23) (Miss.1998) (citing Douglas, 525 So.2d at 1317). Appropriate remedies for a sequestration violation include:
prospectively excluding the witness where prejudice will otherwise ensue; striking the witness’s testimony where connivance gave rise to the testimony; striking the witness’s testimony where the testimony gave rise to prejudice; or, most appropriately, allowing the other party to subject the witness to a “full-bore cross-examination” on the facts of the rule violation.

Id.

¶ 37. Here, there was a violation of Rule 615 because both parties agreed Thompson had been in the courtroom during Curtis’s testimony, even though Rule 615 had been invoked. Accordingly, the trial court prospectively excluded the witness, Thompson, from testifying. We find no error in this regard. White claims she was not allowed to present a complete defense because of this exclusion, but we disagree. The defense called a total of fifteen witnesses during her case-in-chief to establish her claim of self-defense. Nothing in the proffer showed a significant fact that was not presented by another witness. White has not proved her defense was prejudiced in any manner from the exclusion of this witness.
V. The Sufficiency and Weight of the Evidence
¶ 38. White argues that there was insufficient evidence to support her conviction for manslaughter, and the verdict is against the overwhelming weight of the evidence.
¶ 39. Motions for a directed verdict and JNOV both challenge the sufficiency of the evidence. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). “[T]he critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’” Id. (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). The reviewing court must ask “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶ 40. Alternatively, “[w]hen reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Id. at 844 (¶ 18). A trial court’s denial of a motion for a new trial is re *256 viewed for an abuse of discretion. Id. The evidence will be weighed in the light most favorable to the verdict. Id. “Any factual disputes are properly resolved by the jury and do not mandate a new trial.” Moore v. State, 859 So.2d 379, 385 (¶26) (Miss. 2003) (quoting McNeal v. State, 617 So.2d 999, 1009 (Miss.1993)).
¶ 41. Reviewing the evidence in the light most favorable to the prosecution, we find sufficient evidence to convict White of manslaughter. The jury was instructed on the elements of murder, the lesser-included offense of manslaughter, and self-defense. Manslaughter is defined as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.... ” Miss.Code Ann. § 97-3-35 (Rev. 2006). Even though the evidence showed New-some had been harassing and threatening "White about the school-bus incident both on the morning of the shooting and in the weeks previous, there was no evidence Newsome ever committed any act of violence against White. On the morning of the shooting, White was in no immediate danger when she left her trailer armed with a handgun. As annoying as New-some’s rants must have been, they were not justification for a homicide. While White claimed she acted in self-defense, believing Newsome had a weapon rather than a cellular telephone, the issue of self-defense was a question for the jury to resolve. There was sufficient evidence for the jury to find the shooting was unreasonable under the circumstances. Moreover, the verdict was not contrary to the overwhelming weight of the evidence, and does not sanction an unconscionable injustice. White was “tired” of Newsome’s harassment, armed herself, and shot Newsome five times. Accordingly, the sufficiency and weight of the evidence were adequate to support Wfiiite’s conviction for manslaughter.
VI. Cumulative Error
¶ 42. Finally, White argues that even if this Court does not find any individual errors sufficiently egregious to require reversal, the accumulation of errors prevented White from receiving due process and a fair trial, requiring reversal. The cumulative-error doctrine states: “[I]ndividual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial.” Ross v. State, 954 So.2d 968, 1018 (¶ 138) (Miss.2007) (citing Byrom v. State, 863 So.2d 836, 847 (¶12) (Miss.2003)). However, if there are no individual errors, there can be no cumulative error that warrants reversal. Harris v. State, 970 So.2d 151,157 (¶ 24) (Miss.2007) (citing Gibson v. State, 731 So.2d 1087, 1098 (¶31) (Miss. 1998)). Such is the case here, where there were no individual errors. Therefore, this issue is without merit.
¶ 43. For the above reasons, we affirm White’s conviction and sentence.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF CLAIBORNE COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. RUSSELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, J.

. Testimony at trial showed the silver object could have been Newsome’s cell phone, which White’s father found lying on the windshield of her vehicle later that day.

. Oftentimes, police officers are accused of using excessive force. See, e.g., Carswell v. Borough of Homestead, 381 F.3d 235 (3rd Cir.2004); Scott v. City of Goodman, 997 So.2d 270 (Miss.Ct.App.2008). White offered Scott in support of her argument, which was a Mississippi Torts Claim Act case. In Scott, the expert witness for the city testified that officers may exercise discretion and judgment regarding the appropriate use of force under dangerous circumstances. Id. at 277 (¶ 16). White also cited to Carswell in her brief, which deals with the reasonable use of force by a police officer. Carswell, 381 F.3d at 243.

. As the State points out, there is no transcript of the jury-instruction conference in the record, because the parties went "off the record.” Therefore, the reasons the trial judge refused these instructions are not known, nor were objections made by counsel. However, this Court will consider White’s arguments on this issue because the record includes the refused and withdrawn jury instructions, which are marked as such by handwritten notations.

. Section 97-3-15(3) states:
A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, or against a vehicle *251 which he was occupying, or against his business or place of employment or the immediate premises of such business or place of employment, if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person’s will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred. This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or if the person who uses defensive force is engaged in unlawful activity....
(Emphasis added).
Relatedly, section 97-3-15(4) states that:
A person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force ... if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the person's failure to retreat as evidence that the person’s use of force was unnecessary, excessive or unreasonable.

. A "no-duty-to-retreat” rule was stated in White’s own jury instruction D-4, which was given.

. Lester was handed down before the Castle Doctrine was enacted.